**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
          *Plaintiff-Appellee,*

        v.

WILLIE RUSSELL, JR., a/k/a Wild
Bill,

          *Defendant-Appellant.*

No. 04-10681

D.C. No.
CR-04-00054-LKK

OPINION

Appeal from the United States District Court
for the Eastern District of California
Lawrence K. Karlton, Senior Judge, Presiding

Argued and Submitted
November 15, 2005—San Francisco, California

Filed January 30, 2006

Before: Diarmuid F. O'Scannlain, Sidney R. Thomas, and
Richard C. Tallman, Circuit Judges.

Opinion by Judge O'Scannlain;
Partial Concurrence and Partial Dissent by Judge Thomas

**COUNSEL**

Quin Denvir, Federal Defender, Sacramento, California, argued the cause and was on the briefs for the appellant.

William S. Wong, Assistant United States Attorney, Sacramento, California, argued the cause for the appellee. McGregor W. Scott, United States Attorney, was on the brief.

**OPINION**

O'SCANNLAIN, Circuit Judge:

This case requires us to consider whether the emergency doctrine or implied consent can support a warrantless search of a home on suspicion that a 9-1-1 caller or lurking predator was inside.

I

On Saturday, December 23, 2003, Willie Russell, Jr., placed two calls to the Sacramento Sheriff's Office (SSO)

9-1-1 dispatcher. In the first emergency call, Russell identified himself as "Gregory Hines," and explained to the operator that a gun went off and hit him in the foot, that he was wounded and in pain, and that he wanted the dispatcher to call an ambulance. The transcript of the first call shows that the Fire Dispatcher and the SSO Dispatcher were confused as to whether the caller had been shot, or had shot himself. After Russell's call was disconnected, the SSO Dispatcher said to the Fire Dispatcher "[the caller] didn't really confirm that he shot himself. He just said a 'gun went off.' " Each patrol car contained a mounted computer system and monitor, known as a "Mobile Data Terminal," which allows field officers to receive information pertinent to their calls through a "Computer Aided Dispatch," or CAD, which updates text provided by 9-1-1 dispatchers on screens in the police officers' cars. In this case, the CAD Event Report displayed to responding officers: "male stated gun went off and he shot [sic] in foot."

Russell called back and spoke to a second emergency dispatcher, giving his real name and address and stating, "I shot myself in the foot." Over the course of the phone call, Russell explained that he was "moving" the gun out of his bedroom closet when it went off. When asked whether he knew where the gun was currently, Russell first stated, "I don't know," then stated that he "left [the gun] upstairs somewhere. I dropped it on top of stuff on the floor." Russell also stated that "my girlfriend is going to kill me." Police were aware of Russell's comments; the CAD Event Report displayed: "[Willie is] sayin that his gf [girlfriend] is goin to kill him when she finds out what he did . . . gf not @ resd rite now [sic]."

The dispatchers asked whether Russell was alone, and he twice responded that nobody else was present. Again, the CAD Event Report reported to the responding officers that "Willie Russell . . . sed [sic] he is home alone." Later in the phone call, the dispatcher apparently overheard two unidentified female voices and asked whether there were other people there at that point, but Russell did not respond. The transcript

of the phone call shows that female voices could be heard asking about the gun and whether Russell planned to give it to the police. An unidentified female voice asked: "Where's the gun at? Are you going to give 'em the gun?" The CAD Event Report informed the officers that the dispatcher "heard male & fem voice in bkgrnd askn what was goin on [sic]."

Russell told the dispatchers that he had opened the front door for the police:

> Russell:   I'm at the front door. I don't have the gun.
>
> SSO:      You're at the front door.
>
> Russell:   Yes, I crawled to the front door.
>
> SSO:      Okay, is the door unlocked?
>
> Russell:   Yes, I opened the door for them.
>
> SSO:      Okay, the door is open?
>
> Russell:   Please don't make me suffer.
>
> SSO:      The door is open or it's unlocked?
>
> Russell:   The door is open.

After his first call, the emergency dispatchers alerted police, who initially anticipated finding an injured man named "Gregory Hines," the pseudonym Russell supplied to the first emergency dispatcher. While en route the officers received updated information that a second man, "Willie Russell," was injured. As the officers neared Russell's house, the dispatcher informed them that the injured man did not know where the gun could be located, and that the injured man had opened the door for the police. Neither the police nor the emergency dis-

patchers were aware that Willie Russell and Gregory Hines were one and the same.[1]

Deputy Summer Elliott arrived near the scene first but waited outside the cul-de-sac entrance to the street until other units arrived. When asked why she did not enter the neighborhood herself, Deputy Elliott responded that "it is not safe to do so by myself with the unknown circumstances that was [sic] going on at the house. . . . A gun was discharged, and we don't really know what's going on inside." Similarly, Sergeant Roger Dillon explained that "Deputy Elliott staged around the corner. It's a safety issue. We don't go to those kind of calls by ourselves because of — they're not stable and the potential of getting hurt. So she staged around the corner." When other units arrived, Deputy Elliott, along with Sergeant Roger Dillon and Deputy Brian Templeton, entered the neighborhood.

Deputy Elliott testified that she saw a man—Russell, though Deputy Elliott did not know this yet—"hopping out to the car with two other females coming out of the garage door." Sergeant Dillon noted that there were two women with the injured man, though he had expected him to be alone. He testified that:

> all the call kept saying is that there is no one else in the house, but then we're getting the conflicting information of other names. I did not — I did not see anything in the events or hear anything on the radio that would tell me that there were females on the scene at all.

The other officers were not asked whether they expected Russell to be alone.

---

[1]The parties did not supply a record of any radio transmissions between dispatchers and the responding officers, so our analysis follows the facts presented in the exhibits and testimony from the pretrial suppression hearing.

Deputy Elliott ordered Russell out of the car and began questioning him, but kept her weapon holstered. When Deputy Elliott asked Russell to identify himself, he refused. Deputy Elliott was similarly rebuffed when she asked Russell "what happened there." Russell did not express to Deputy Elliott any objection to the entry of the other officers into the residence.

While Deputy Elliott was questioning Russell outside the house, Sergeant Dillon and Deputy Templeton immediately entered the house with their guns drawn. Sergeant Dillon testified that "for my safety, I drew my gun and kept it in a ready position where I could engage anyone who might pop up out of a closet, out of a doorway, out of anywhere." Sergeant Dillon explained that his "intent was to go through the house to look to see if there were any other victims inside the residence, anyone that was injured and needed medical attention, or if there was a suspect that may have injured the subject who in the event claimed to have been shot in the foot." He testified that "I was looking for another victim. And I was looking for possibly an armed subject inside the house." Sergeant Dillon then found the weapon in plain view in Russell's bedroom, but found no other person—injured or otherwise.

Russell was charged with a violation of 18 U.S.C. § 922(g)(1), which makes unlawful the possession of a firearm by a convicted felon. Russell moved to suppress the gun evidence. The district court denied the motion after an evidentiary hearing, holding that the exigent circumstances exception supported the search, and in the alternative, that Russell had consented to the search of his residence:

> The situation was one in which there was sufficient uncertainty that it made perfect sense for the law enforcement officers to try to ensure that there wasn't another victim—or there might be some other circumstances which would require their clearing the house.

> I also believe . . . that there was a consent and that the consent was not conditioned. And that while I agree with [defense counsel] that the circumstances giving rise to the consent no longer applied, the consent was still out there.

Russell subsequently entered a guilty plea pursuant to an agreement that reserved his right to appeal the denial of his motion to suppress.[2]

## II

[1] Russell contends that the warrantless search cannot be sustained under the emergency doctrine. Our case law recognizes that the emergency doctrine, an exception to the warrant requirement, may support a warrantless search "if a police officer, while investigating within the scope necessary to respond to an emergency, discovers evidence of illegal activity, that evidence is admissible even if there was not probable cause to believe that such evidence would be found." *United States v. Cervantes*, 219 F.3d 882, 888 (9th Cir. 2000). *See also United States v. Stafford*, 416 F.3d 1068, 1073 (9th Cir. 2005).

The emergency doctrine derives from *Mincey v. Arizona*, 437 U.S. 385 (1978), which recognized police officers' community caretaking function. *See id.* at 392 (noting that the Court did "not question the right of the police to respond to emergency situations" without a warrant). *United States v. Cervantes*—building on *Mincey*—adopted three requirements for the emergency doctrine:

---

[2]Whether exigent circumstances support a warrantless search is a mixed question of law and fact which we review *de novo*. *United States v. Bynum*, 362 F.3d 574, 578-79 (9th Cir. 2004); *United States v. Zermeno*, 66 F.3d 1058, 1063, n. 2 (9th Cir. 1995). We review findings of fact underlying the district court's determination for clear error. *Bynum*, 362 F.3d at 578-79.

(1)    The police must have reasonable grounds to believe that there is an emergency at hand and an immediate need for their assistance for the protection of life or property.

(2)    The search must not be primarily motivated by intent to arrest and seize evidence.

(3)    There must be some reasonable basis, approximating probable cause, to associate the emergency with the area or place to be searched.

219 F.3d at 888 (quoting *People v. Mitchell*, 39 N.Y.2d 173, 347 N.E.2d 607, 609, 383 N.Y.S.2d 246 (N.Y. 1976)). *See also United States v. Martinez*, 406 F.3d 1160, 1164 (9th Cir. 2005); *Martin v. City of Oceanside*, 360 F.3d 1078, 1082 (9th Cir. 2004); *United States v. Bradley*, 321 F.3d 1212, 1214 (9th Cir. 2003).

A

Russell first argues that the police did not have "reasonable grounds to believe that there [was] an emergency at hand and an immediate need for their assistance for the protection of life." *Cervantes*, 219 F.3d 888.

1

**[2]** Our analysis of the record indicates that even though the police observed that one man had exited the residence before they arrived, there was confusion as to whether this was the only injured person. The police had reason to believe that there were two injured men at Russell's residence—one named Gregory Hines and the other named Willie Russell. Indeed, the police received a variety of conflicting data. They were told first, that one person had been shot in the foot; then another shot himself in the foot; then the police were told the caller was alone; then that his girlfriend was going to kill him;

and then that Russell might not be alone. When the police finally arrived at Russell's home, they found one injured person (rather than two) in the driveway (rather than in the house) accompanied by two women (rather than alone). Given the substantial confusion and conflicting information, the police were justified in searching the house in order to determine whether there were other injured persons, as their information indicated was the case.

2

**[3]** Russell next argues that it was "manifest" that only one person had placed two phone calls. We disagree. Even in retrospect, the officers' confusion is understandable. In Russell's first call, the emergency dispatch operator noted that the victim stated that he had been shot, not that he had shot himself. When Russell placed a second call and spoke with a different emergency operator and stated that he had shot himself, the circumstances he described were different. Even with perfect information and sufficient time to digest and analyze it, the police would still have been justified in entering the house.[3] Thus, given the circumstances, it cannot be said that the situation was clear, or that the fact of a sole injured person was evident, or even that the shooting had been accidental.

**[4]** Even if the situation were clear in hindsight, however, the police had only a few minutes in which to determine whether a lurking predator or injured person in need of assistance might be inside the house. It is unreasonable to expect the police to piece together a perfectly coherent picture in the scant minutes they had to digest the constantly-updated and conflicting information. *See Graham v. Connor*, 490 U.S.

---

[3]Russell attempts to rely on the collective knowledge doctrine, which extends to the knowledge of the police dispatchers. *See United States v. Fernandez-Castillo*, 324 F.3d 1114, 1118 (9th Cir. 2003). However, because Russell spoke to two different emergency operators, no single operator was aware that the same injured person had placed both calls.

386, 397 (1989) (cautioning against second-guessing police officers, who "are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving").

3

Russell also argues that our prior cases emphasize that the officers must first determine that there was an emergency before entering the house. In *United States v. Bradley*, for example, the court noted that "before the officers entered the house, they took several other steps," including knocking on the front door and speaking with neighbors before entering the house. 321 F.3d at 1215. In *United States v. Deemer*, the officers, responding to an emergency call from an intoxicated caller, only made an emergency entry after the woman who answered the door stated that she was alone, but police heard movement behind the door. 354 F.3d 1130, 1132 (9th Cir. 2003). Russell also points to *Martin v. City of Oceanside*, where the police, responding to a concerned father's call about his daughter, spoke to neighbors before entering the house. 360 F.3d at 1082. Finally, in *United States v. Martinez*, we affirmed the district court's denial of a motion to suppress based on the emergency doctrine where the police responded to a domestic violence call and entered the house only after hearing screaming coming from inside. 406 F.3d 1160. Based on this case law, Russell argues that the police should have stopped to speak with him, or his mother or girlfriend who were helping him into the car, to determine whether there were additional injured persons in the house.

[5] Russell's argument is unconvincing for several reasons. Most obviously, our case law clearly requires that the police must only have "reasonable grounds to believe that there is an emergency at hand and an immediate need for their assistance for the protection of life." *Cervantes*, 219 F.3d at 888. Russell's analysis, however, would incorporate a fourth requirement into the emergency doctrine: that the police obtain

independent verification or other information relating to the emergency before entering the house.[4] We decline to read an additional limitation into the emergency exception's settled case law. Further, such a requirement would dramatically slow emergency response time, and would therefore be at odds with the purpose of the emergency doctrine— "allow[ing] police to respond" to emergency situations.[5] *Mincey*, 437 U.S. at 392. The only requirement—which the police easily met—is that they have "reasonable grounds to believe that there is an emergency at hand." Given the circumstances, the officers and dispatchers clearly believed there was an ongoing emergency.[6]

Further, *Bradley*, *Martin*, and *Deemer* do not stand for the proposition for which Russell cites them. In each of these cases, the police had to take additional steps to determine whether there was an emergency that justified entry in the first place. In *Bradley*, the police "could not locate [the missing child] in the places [his mother] said he was." 321 F.3d at 1215. In order to determine whether there was actually an emergency that justified entry, the police took steps to determine if the child was with neighbors before entering Russell's house. Similarly, in *Martin*, the police were responding to a father concerned about his daughter—who had not answered her phone—and were therefore uncertain whether there was

---

[4]We agree with the dissent's characterization of the emergency exception as "well-delineated." Dissent at 1225 (quoting *Martinez*, 406 F3d. at 1164). This is precisely why we decline to read a further requirement into the exception.

[5]Indeed, the facts of this case illustrate why such a requirement would be dangerous: had the police been forced to stop and speak with Russell, who steadfastly refused to divulge any information to officers on the scene, their capability to rescue a potentially injured person inside would have been dramatically handicapped.

[6]What's more, the district court concluded that the police believed there was an emergency. While the dissent reaches a different conclusion, Dissent at 1228-29, we may not disturb the district court's factual conclusion unless clearly erroneous, which it is not. *Bynum*, 362 F.3d at 578-79.

an actual emergency. In *Deemer*, again, the police were uncertain whether there was any emergency basis for entering the motel room, so they spoke to the woman who answered the door. In *Martinez*, in contrast, the police entered the house because the circumstances—a bruised female outside and screaming coming from the inside—indicated that there was an emergency. These cases indicate that the police only must take additional steps if they otherwise lack reasonable grounds to believe there is an emergency. *Cervantes* requires no more, and our case law imposes no additional restriction beyond the reasonable grounds requirement.

[6] Applying these cases to the present facts, the police had good reason to believe that there was an emergency and did not need independent confirmation: they had already received two emergency phone calls, saw only one severely injured person when they arrived at the scene, and therefore had reasonable grounds to believe another might be inside the house.[7] Therefore, the district court did not clearly err in concluding that the officers had reasonable grounds to believe that there was an emergency requiring their immediate intervention.

B

[7] Next, Russell suggests improper motive. We are satisfied that the district court did not clearly err in determining

---

[7]The dissent argues that in Russell's second call he cleared up the confusion he created by "describ[ing] what had happened in detail" and "verify[ing] that he was alone in the house." Dissent at 1226. However, Russell never explained to the emergency dispatcher that he had previously reported a similar—though not identical—shooting under a different name. Similarly, shortly after Russell "verified that he was alone," dispatchers overheard voices in the background. Dissent at 1226. Even if an omnipotent dispatcher had concluded that one of the voice's was that of Russell's girlfriend, this could hardly assuage the officers' concern—after all, Russell had just stated that his girlfriend was going to kill him. *See supra* at 1213. Russell may have intended to explain and defuse the situation, but we conclude, like the district court, that he failed miserably.

that the police entered Russell's house motivated by an intent to determine if there were any remaining victims or lurking predators who might harm or harass emergency personnel. The police entered the house with their guns drawn and swept through the house in less than two minutes, a style of search clearly inconsistent with an intent to discover and seize evidence.[8] In any event, the district court made a factual decision to credit the officers' testimony regarding their motive, concluding that it was benign. Even if the facts support other conclusions, they do not compel one in particular. The district court's conclusion—that the discovery of the evidence was only ancillary to the officers' main goal—was not clearly erroneous.

## C

Finally, Russell suggests that the search was excessive. Our review indicates that the district court did not clearly err in determining that the police had a reasonable basis to associate the places searched with the emergency in question. The police searched only areas in which a potential criminal could have been hiding in wait and areas in which an additional victim would have been waiting for assistance. The police searched no drawers or other areas where an armed or injured person could not conceivably have been hidden.

## III

Russell also challenges the district court's alternative holding that consent to the search was implied. In light of our conclusion that the search was supported by the emergency doctrine, we need not address the implied consent issue.

---

[8]Following the discovery of the gun, and after radioing to fire and medical assistance teams that the scene was clear, the police engaged in a general search of the residence. As noted by the district court, however, the police initiated this search *after* discovering the gun. It is not, therefore, relevant to the question whether the initial emergency search, which was extremely brief, was proper.

IV

**[8]** Russell urges that a limited *Ameline* remand should be available because he has an "unpreserved *Booker* error that may have affected [his] substantial rights, and the record is insufficiently clear to conduct a complete plain error analysis." *United States v. Ameline*, 409 F.3d 1073, 1074 (9th Cir. 2005) (en banc). Russell was indeed sentenced under the Sentencing Guidelines pursuant to a statute without a mandatory minimum and did not present a Sixth Amendment challenge. Therefore, "a limited remand to the district court is appropriate for the purpose of ascertaining whether the sentence imposed would have been materially different had the district court known that the sentencing guidelines were advisory." *Id. See also United States v. Murillo*, 419 F.3d 906, 916 (9th Cir. 2005).

**AFFIRMED IN PART; REMANDED IN PART.**

THOMAS, Circuit Judge, concurring in part and dissenting in part:

I agree that an *Ameline* remand is appropriate in this case. However, I respectfully disagree that the emergency doctrine justified a warrantless search.

The emergency doctrine is a very limited and specific exception to the requirement that a search warrant be obtained before searching a private residence. "[P]hysical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *Payton v. New York*, 445 U.S. 573, 585 (1980) (quoting *United States v. U.S. District Court*, 407 U.S. 297, 313 (1972)). For that reason, "searches and seizures inside a home without a warrant are presumptively unreasonable." *Id.* at 586. As the Supreme Court noted in *Mincey v. Arizona*, 437 U.S. 385 (1978):

The Fourth Amendment proscribes all unreasonable searches and seizures, and it is a cardinal principle that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject to a few specifically established and well-delineated exceptions."

*Id.* at 390 (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)).

We have defined two "specifically established and well-delineated exceptions" to the warrant requirement: exigency and emergency. *United States v. Martinez*, 406 F.3d 1160, 1164 (9th Cir. 2005). The exigency exception, which is not at issue in this case, permits a warrantless search "if there is probable cause to believe that contraband or evidence of a crime will be found at the premises and that exigent circumstances exist." *Id.* (citing *United States v. Lai*, 944 F.2d 1434, 1441 (9th Cir. 1991)).

At issue in this case is the emergency exception to the warrant requirement, which permits a warrantless search when officers "reasonably believe that a person within is in need of immediate aid." *Id.* at 392. "The emergency doctrine is based on and justified by the fact that, in addition to their role as criminal investigators and law enforcers, the police also function as community caretakers." *United States v. Stafford*, 416 F.3d 1068, 1073 (9th Cir. 2005).

However, "[t]he police's authority to search and seize property when acting in its role as 'community caretaker' has a different source than its authority to search and seize property to investigate criminal activity." *Miranda v. City of Cornelius*, 429 F.3d 858, 863 (9th Cir. 2005). Because there are sharp distinctions between the community caretaking and law enforcement roles of the police, the analysis under the emergency "community caretaker" doctrine differs significantly

from the analysis we undertake when police are performing law enforcement functions. *Id.*

Under the emergency community caretaker doctrine, the reasonable suspicion must be of need, not criminal activity. When law enforcement officers are rendering emergency aid, they are performing a community caretaker function; when they are investigating the cause of an emergency, they are performing a law enforcement function.

To justify application of the emergency doctrine, three circumstances must exist:

> (1) The police must have reasonable grounds to believe that there is an emergency at hand and an immediate need for their assistance for the protection of life or property. (2) The search must not be primarily motivated by intent to arrest and seize evidence. (3) There must be some reasonable basis, approximating probable cause, to associate the emergency with the area or place to be searched.

*United States v. Cervantes*, 219 F.3d 882, 888 (9th Cir. 2000) (quoting *People v. Mitchell*, 347 N.E.2d 607, 609 (N.Y. 1976)). We analyze the "reasonable grounds to believe that there is an emergency at hand," on an objective basis, taking into consideration the collective knowledge of the officers at the time. *United States v. Sutton*, 794 F.2d 1415, 1426 (9th Cir. 1986).

In this case, dispatchers received two almost identical calls from the same household indicating that a man had accidentally shot himself in the foot. The dispatchers were uncertain from the first call as to the source of the shooting, but they never communicated that to the officers proceeding to the scene. That uncertainty was cleared up in the second call, in which Russell described what had happened in detail. He verified that he was alone in the house. He also answered the dis-

patcher's multiple questions about the location of the firearm, culminating in this exchange:

Russell: Oh my goodness people — Oh, no. Please. Please don't let me die. Hello.

Dispatcher: I'm still here, Willie.

Russell: Why they not here, Ma'am?

Dispatcher: They're on their way there. Okay?

Russell: (Moaning) Oh, my God. Oh, please tell those people to hurry up.

Dispatcher: They're on their way. I need you to think about this. What happened to the gun?

Russell: I left it upstairs somewhere. I dropped it on top of stuff on the floor.

Dispatcher: Okay. You left it upstairs. Are you . . .

Russell: Why do you keep asking me that?

Dispatcher: Because I want my officers to know where that weapon is before they come in that residence.

Russell: I'm at the front door. I don't have the gun.

Dispatcher: You're at the front door.

Russell: Yes, I crawled to the front door.

Dispatcher: Okay, is the door unlocked?

Russell:       Yes, I opened the door for them.

Dispatcher: Okay, is the door open.

Russell:       Please don't make me suffer.

Dispatcher: The front door is open or it's unlocked?

Russell:       This door is open.

Dispatcher: Okay.

At that point, the owner of the house and Russell's mother arrived. The dispatcher overheard the exchange in which Russell told them that he shot himself in the foot.

After the initial communications, the officers sent to the scene were informed by the dispatcher that Russell said he was home alone and was moving a gun from the bedroom to a closet when it went off. The officers were informed by the dispatcher that Russell had crawled to the front door and opened it for the officers.

When the first officer arrived, she waited outside the entrance to the cul-de-sac for four minutes until the other units reached the scene. As she pulled up, she saw Russell hopping out to a car parked in the driveway with a towel wrapped around his leg, accompanied by the two women. Russell entered the back seat of the car, and one woman entered the front of the vehicle. The officer ordered the driver out of the car. The women were not questioned. Two other officers arrived at the scene and saw the first officer talking with Russell.

At that point there was no objective evidence that any victim was in the house in need of immediate aid. The officers made no attempt at the scene to ascertain whether there was anyone in the house. The women were not questioned, nor did

the officers question Russell. The objective evidence at hand, from Russell's firsthand accounts, was that he had shot himself accidentally in the foot in an upstairs bedroom and had dropped the firearm. No evidence at the scene contradicted this report.

However, rather than taking steps to ascertain the situation, the arriving officers immediately proceeded to enter and search the house with guns drawn. They methodically searched the house and found the firearm in an upstairs bedroom on the floor of a closet. Upon finding the gun, the officers remained in the room until other officers arrived. Then, the officers continued their general search. As one of the officers testified at the suppression hearing:

> Q. At some point Sargeant Dillon found a firearm?
>
> A. Yes, sir.
>
> Q. Correct? Then you continued to search after that, right?
>
> A. Yes, sir.
>
> Q. Right? And you were searching for other ammunition and firearms?
>
> A. Yes, sir.
>
> Q. Okay. And during the course of that, you found a pill bottle in a drawer?
>
> A. Yes, sir.
>
> Q. And you seized that?
>
> A. Yes, sir.

Q.    Correct? And you also claimed that you — that you saw several narcotics smoking pipes located in an open drawer in plain view; is that correct?

A.    Yes, sir.

Q.    But in fact they were not, they were inside some kind of a case; isn't that correct?

A.    A paper bag sir.

The officers verified at the suppression hearing that they continued to search after they had determined that nobody else was present in the house and that none of the searching officers had made any inquiries prior to the search to ascertain whether they were additional victims in the house.

Under these circumstances, the emergency exception did not justify a warrantless search.[1] The objective evidence indicated that the victim was already outside; he had informed the dispatcher that he was alone in the house; the women who arrived later were already outside; there was no objective evidence on the scene that there was a victim in the house in need of immediate assistance; no inquiries were made to determine whether there was another injured person in the house; the search continued after the officers ascertained that there was no one else in the house; and the search was not confined to looking for persons in need of medical attention, but included searching drawers and paper bags. One of the

---

[1]The majority claims that the district court made a factual finding of emergency, to which we must defer. However, the record does not support this assertion. The district court did not even use the word "emergency" in its findings, much less make a specific finding of emergency. In any case, as the majority notes, the determination of the circumstances under which a warrantless search may be authorized is a mixed question of fact and law that we review *de novo*. *United States v. Bynum*, 362 F.3d 574, 578-79 (9th Cir. 2004); *Martinez*, 406 F.3d at 1163.

officers who searched and discovered the firearm remained in the room securing the gun until "someone relieved me inside the house to maintain control over the crime scene inside the house."

The totality of the circumstances indicates that the officers were investigating the cause of the emergency in conducting the search—a law enforcement function, and not rendering assistance to a person in need of immediate aid—a community caretaking function. They were treating the house as a crime scene. Their suspicions of criminal activity may well have been aroused by Russell's initial use of a false name, but suspicions of criminal activity do not justify employment of the emergency community caretaker exception to conduct a warrantless search. The Supreme Court has made it quite clear that there is no "crime scene" exception to the warrant requirement. *Mincey*, 437 U.S. at 395.

The government properly concedes that we have never extended the community caretaker doctrine this far. In every case in which we have applied the emergency doctrine, officers had objective evidence that immediate emergency aid was required and took further steps to verify that there was, in fact, an emergency situation present in the premises. The best case that the government offers is *Martinez*. However, in *Martinez*, the officers heard shouting inside a house in which a victim had exited and had reason to believe that a man inside the house might be injured. The officers also questioned persons at the scene before entering. The officer who entered the house did not conduct a general search, but only observed a weapon in plain view on the couch as he was removing the occupant. 406 F.3d at 1165. In *Martinez*, we also recognized the especially volatile and dangerous nature of domestic disputes. *Id.*

I recognize fully and appreciate the need for law enforcement to make split second decisions when confronted with emergency situations. We must be deferential to the judg-

ments of officers who are responding to potentially dangerous situations. However, we deprive the emergency doctrine of its vitality when we condone generalized warrantless searches in vacant houses when the person in need of immediate aid has already departed. Searching drawers and paper bags after the officers have ascertained that there is no one in need of aid cannot be considered rendering emergency medical assistance. After medical aid has been given, and the emergency quelled, officers are certainly justified in investigating the cause of the emergency; but this is a law enforcement function subject to the usual rules pertaining to law enforcement searches and seizures. For these reasons, in my view, under the circumstances presented by this case, the government has not overcome the presumption that a warrantless search of a private residence is unreasonable under the Fourth Amendment.