**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
            *Plaintiff-Appellee,*

            v.

SONNY SNIPE,
            *Defendant-Appellant.*

No. 06-30215

D.C. No.
CR-05-00193-BLW

OPINION

Appeal from the United States District Court
for the District of Idaho
B. Lynn Winmill, District Judge, Presiding

Argued and Submitted
February 7, 2007—Portland, Oregon

Filed January 28, 2008

Before: David R. Thompson, Andrew J. Kleinfeld, and
Jay S. Bybee, Circuit Judges.

Opinion by Judge Bybee

**COUNSEL**

David N. Parmenter, Esq., Blackfoot, Idaho, for the defendant-appellant.

Michelle Mallard, Assistant United States Attorney, United States Attorney for the District of Idaho, Pocatello, Idaho, for the plaintiff-appellee.

**OPINION**

BYBEE, Circuit Judge:

Appellant Sonny Snipe[1] challenges his conviction and sen-

---

[1]Appellant's surname is spelled inconsistently throughout the record. We refer to Appellant as Snipe, pursuant to the Presentence Report, which states: "The defendant's true name is Sonny Ray Snipe, not Snipes as listed in the indictment."

tence for possession of a firearm with an obliterated serial number in violation of 18 U.S.C. § 922(k) and 18 U.S.C. § 924(a)(1)(B). Snipe's conviction followed a warrantless entry by police, who were responding to an emergency call. During the course of their search, police saw drugs in plain view. They returned with a search warrant and seized drugs and the firearm. Our review of Snipe's motion for suppression requires us to revisit, and modify, our decision in *United States v. Morales Cervantes*, 219 F.3d 882, 888 (9th Cir. 2000), in light of the Supreme Court's recent decision in *Brigham City v. Stuart*, 126 S. Ct. 1943 (2006). For the reasons set forth below, we affirm.

I

At approximately 5 A.M. on January 1, 2005, an unidentified "very hysterical sounding" male called the Fort Hall Police Department. The caller screamed something to the effect of "[g]et the cops here now" or "[g]et the cops now" to the residence of Dennis Snipe, Sonny's father. The call was then disconnected. The police dispatcher contacted two officers on a secure emergency frequency and instructed them to report to the Snipe residence. Activating their emergency lights, Officers Jesse Rodriguez and Mark Massey responded separately to the dispatch. Arriving at the residence, Rodriguez—who lived down the street—noticed a vehicle that he did not recognize parked in front of the house and an individual that he also did not recognize "walking into the residence." *Id.*[2] Both officers also noted that—unlike the other homes in the area—the residence's lights were on.

Rodriguez and Massey proceeded to the residence and noted that the door was partially ajar. Rodriguez then knocked

---

[2]In his suppression hearing testimony, Massey recalled that after he arrived on the scene, he met briefly with Rodriguez who told him that "he [had] observed somebody *running* into the house as he pulled in." (emphasis added).

on the door and announced "Fort Hall Police Department." The force apparently knocked the door open, and both officers stepped inside. Upon entering, Rodriguez noticed an individual sitting on the couch that he did not recognize and—apparently a split second later—noticed several other individuals seated around a kitchen table, including Snipe. The individuals at the table reacted with surprise to the officers' arrival and asked why they were there. Rodriguez then asked who was hurt and stated that the police "had received a call [from] a hysterical male" asking the police to come to the residence. As Rodriguez spoke, both officers noticed "what looked like . . . a large amount of drugs" sitting on the kitchen table, but neither officer mentioned or questioned the individuals about the drugs because the officers "were mainly concerned if there was someone hurt inside the residence."

After denying anyone was hurt, Snipe told Massey "to go ahead and look around" and upon Rodriguez's suggestion, Massey proceeded to look through the residence. Massey checked the entire residence, except for a locked bedroom; when Massey asked Snipe why the room was locked, Snipe responded that the room was his father's and he did not have a key. Snipe told Massey, however, that he could "[j]ust kick it in" if he needed to search that room too. Massey declined to kick in the door. After determining that there was no emergency, the officers left the house and promptly obtained a search warrant based on their observation of illegal drugs on the kitchen table. During a subsequent search, the officers discovered more drugs, drug paraphernalia, and a firearm with an obliterated serial number.

Snipe was indicted for possession of a firearm with an obliterated serial number in violation of 18 U.S.C. § 922(k) and 18 U.S.C. § 924(a)(1)(B). Following his indictment, Snipe and a co-defendant moved to suppress the illegal drugs and the firearm on the ground that the evidence was the product of an illegal entry. The district court denied that motion, and Snipe subsequently pled guilty. At sentencing, Snipe

objected to the finding of the Presentence Report ("PSR") that he was a prohibited person in possession of a firearm pursuant to U.S. SENTENCING GUIDELINES MANUAL ("U.S.S.G.") § 2K2.1(a)(6)(A). Snipe did not, however, object to the PSR's finding that he was a regular user of methamphetamine or his own admission, contained in that report, that "he had probably . . . used drugs a 'couple of days' " before January 1, 2005. Indeed, at sentencing, both Snipe and his counsel stated that "around the time of the incident [he] had a meth problem." On that basis, the district court found, consistent with the PSR, that Snipe was a prohibited person and sentenced him to 15 months imprisonment. Snipe now timely appeals.

II

Snipe challenges both his conviction and sentence. We address each in turn.

A.   *Snipe's Conviction*

Snipe challenges his conviction on the ground that the district court erroneously denied his suppression motion.[3] "We review de novo the denial of a motion to suppress, . . . while the underlying factual findings are reviewed for clear error." *United States v. Crawford*, 372 F.3d 1048, 1053 (9th Cir. 2004) (en banc); *accord United States v. Rowland*, 464 F.3d 899, 903 (9th Cir. 2006). Applying that standard, as set forth below, we affirm Snipe's conviction. The officers' initial entry was justified by exigent circumstances, and their subsequent observations of illegal drugs in plain view provided probable cause for the search warrant that led to their finding the firearm with an obliterated serial number.

---

[3]The government conceded at Snipe's plea colloquy that because there was no formal plea agreement, Snipe retained the right to appeal the district court's suppression ruling. Thus, the government has waived any procedural bar to appealing pre-conviction motions that might be associated with the entry of an unconditional guilty plea. *See United States v. Jacobo Castillo*, 496 F.3d 947, 954 (9th cir. 2007) (en banc).

"[W]arrants are generally required to search a person's home or his person unless 'the exigencies of the situation' make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." *Mincey v. Arizona*, 437 U.S. 385, 393-94 (1978) (quoting *McDonald v. United States*, 335 U.S. 451, 456 (1948)).[4] " 'The need to protect or preserve life or avoid serious injury is' " one such " 'justification for what would be otherwise illegal absent an exigency or emergency.' " *Id.* at 393 (quoting *Wayne v. United States*, 318 F.2d 205, 212 (D.C. Cir. 1963) (Burger, J.)). The district court relied on that doctrine in denying Snipe's motion. In so doing, the district court applied this court's three-part test adopted in *United States v. Morales Cervantes*, 219 F.3d 882, 888 (9th Cir. 2000), which required that:

> (1) The police must have reasonable grounds to believe that there is an emergency at hand and an immediate need for their assistance for the protection of life or property. (2) The search must not be primarily motivated by intent to arrest and seize evidence. (3) There must be some reasonable basis, approximating probable cause, to associate the emergency with the area or place to be searched.

(quoting *People v. Mitchell*, 347 N.E.2d 607, 609 (N.Y. 1976)). The district court held the government met that test.

**[1]** After the district court's decision, the Supreme Court decided *Brigham City v. Stuart*, 126 S. Ct. 1943 (2006), which was intended to resolve "differences among state courts

---

[4] The Fourth Amendment provides that, "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. CONST. amend. IV.

and the Courts of Appeals concerning the appropriate Fourth Amendment standard governing warrantless entry by law enforcement in an emergency situation." In *Brigham City*, the Court began by reaffirming the principle that, "law enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." *Id.* Next, turning to the standard governing such entries, the Court held that, as in other Fourth Amendment contexts, "[t]he officer's subjective motivation is irrelevant" to determining whether such entries are justified. *Id.;* s*ee also Whren v. United States*, 517 U.S. 806, 813 (1996) ("[W]e have been unwilling to entertain Fourth Amendment challenges based on the actual motivations of individual officers."). Instead, in determining whether such entries are justified, *Brigham City* only asked—with reference to the whole record—whether the circumstances, viewed objectively, justify the action, 126 S. Ct. at 1948, and whether "the manner of the officers' entry was also reasonable," *id.* at 1949. *See also id.* at 1948-49 (holding the police met the first test because "the officers had an objectively reasonable basis for believing" a person inside the house was injured and the violence was ongoing); *id.* at 1948-49 (holding "[t]he manner of the officers' entry was also reasonable" because the police repeatedly attempted to announce their presence).

[2] *Brigham City* requires us to reconsider and revise *Cervantes* in three critical respects.[5] The first prong of *Cervantes* survives *Brigham City*, and indeed remains the core of the Fourth Amendment analysis of exigent circumstances. Considering the totality of the circumstances, law enforcement must have an objectively reasonable basis for concluding that there is an immediate need to protect others or themselves

---

[5]Though we have noted *Brigham City*'s holding in the past, *see, e.g.*, *United States v. Black*, 466 F.3d 1143, 1146 n.1 (9th Cir. 2006); *United States v. Martinez-Rodriguez*, 472 F.3d 1087, 1096 (9th Cir. 2007), we have not yet explicitly considered *Brigham City*'s effect on our decision in *Cervantes*.

from serious harm. Second, because *Brigham City* rejected any subjective analysis, we reject *Cervantes*' subjective second prong and hold that law enforcement's subjective motivations are irrelevant in determining whether the emergency doctrine applies. Third, we also reject *Cervantes*' third prong —and Snipe's attempt to engraft an expanded probable cause inquiry onto that prong—as superfluous because *Brigham City* failed to conduct any traditional probable cause inquiry. Instead, the Court assumed that probable cause to associate the emergency with the place to be searched exists whenever law enforcement officers have an objectively reasonable basis for concluding that an emergency is unfolding in that place. Indeed, even before *Brigham City*, both the Second and Eleventh Circuits had held that, "in an emergency, the probable cause element may be satisfied where officers reasonably believe a person is in danger." *United States v. Holloway*, 290 F.3d 1331, 1338 (11th Cir. 2002); *accord Koch v. Brattleboro*, 287 F.3d 162, 169 (2d Cir. 2002). And finally, because *Brigham City* explicitly considered the officers' manner of entry, we hold that any subsequent review of an entry pursuant to the exigent circumstances doctrine must consider the officers' manner of entry.

**[3]** Thus, in place of *Cervantes*, we now adopt a two-pronged test that asks whether: (1) considering the totality of the circumstances, law enforcement had an objectively reasonable basis for concluding that there was an immediate need to protect others or themselves from serious harm; and (2) the search's scope and manner were reasonable to meet the need. Under that test, then, as previously under *Cervantes*, if law enforcement, while "respond[ing] to an emergency, discovers evidence of illegal activity, that evidence is admissible even if there was not probable cause to believe that such evidence would be found." 219 F.3d at 888.[6]

---

[6]Snipe argues that any new test should include prongs considering "the gravity of the underlying offense" and "the violent behavior the officers

Other circuits have reached similar conclusions. For instance, the Sixth Circuit has held that in cases involving the emergency doctrine, "[t]he government, in order to satisfy the exigent-circumstances exception" must demonstrate that—considering the totality of the circumstances—the search was objectively reasonable because "there was a risk of serious injury posed to the officers or others that required swift action." *United States v. Huffman*, 461 F.3d 777, 783 (6th Cir. 2006). The Tenth Circuit—which before *Brigham City* applied nearly the same three-part test as this circuit—has held that *Brigham City* excised the second prong of the old three part test and rejected any traditional probable cause inquiry under the third prong. *United States v. Najar*, 451

---

witnessed outside of the home." Neither argument has merit. The suggestion that "the gravity of the underlying offense" should be part of *Brigham City*'s test would be problematic because requiring officers to weigh the severity of the ongoing emergency before responding "would dramatically slow emergency response time, and would therefore be at odds with the purpose of the emergency doctrine—allow[ing] police to respond to emergency situations." *United States v. Russell*, 436 F.3d 1086, 1092 (9th Cir. 2006) (internal quotation marks omitted).

Snipe's assertion that the police must witness ongoing violence before responding to an emergency conflicts not only with the purposes underlying the emergency doctrine but also with *Brigham City*'s express statement that police officers do *not* have to wait for violence before acting. 126 S. Ct. at 1949 ("The role of a peace officer includes preventing violence and restoring order, not simply rendering first aid to casualties."); *see also United States v. Brown*, 64 F.3d 1083, 1086 (7th Cir. 1995) ("We do not think that the police must stand outside an apartment, despite legitimate concerns about the welfare of the occupant, unless they can hear screams. Doubtless outcries would justify entry, but they are not essential." (internal citations omitted)); 3 WAYNE R. LAFAVE, SEARCH AND SEIZURE: A TREATISE ON THE FOURTH AMENDMENT § 6.6 (4th ed. 2004) ("[B]y design or default, the police are also expected to reduce the opportunities for the commission of some crimes through preventative patrol and other measures, aid individuals who are in danger of physical harm, assist those who cannot care for themselves, resolve conflict, create and maintain a feeling of security in the community, and provide other services on an emergency basis." (internal quotations omitted)).

F.3d 710, 715, 718 (10th Cir. 2006) (noting that *Brigham City* did not "require probable cause in this type of exigent circumstance[ ]"). Consequently, the Tenth Circuit adopted a new two-part test that asks, like the test we adopt here,"whether (1) the officers have an objectively reasonable basis to believe there is an immediate need to protect the lives or safety of themselves or others, and (2) the manner and scope of the search is reasonable." *Id.* at 718.

**[4]** In this case, the police meet both prongs of the test. First, the officers had an objectively reasonable basis for believing there was an immediate need to protect individuals at the Snipe residence from serious harm. In determining whether such an entry is objectively reasonable, the Supreme Court has "consistently eschewed bright-line rules, instead emphasizing the fact-specific nature of the reasonableness inquiry," and looked to the totality of the circumstances. *Ohio v. Robinette*, 519 U.S. 33, 39 (1996); *accord United States v. Banks*, 540 U.S. 31, 36 (2003) ("[W]e have treated reasonableness as a function of the facts of cases so various that no template is likely to produce sounder results than examining the totality of circumstances in a given case; it is too hard to invent categories without giving short shrift to details that turn out to be important in a given instance, and without inflating marginal ones."). As we consider the totality of the circumstances here, we begin by observing that the officers knew that they were responding to an emergency call by "a hysterical male" who instructed the dispatcher to "[g]et the police over here now" and that call alone largely justified their response. Furthermore, it was objectively reasonable to believe the caller had an emergency, even though that call did not come in on the department's 911 system, because, as the police dispatcher testified, emergency calls routinely come in on regular lines. That the call came in at 5 A.M. also contributes to the objective reasonableness of that perception.

Snipe argues that the police should have done something to verify the caller's identity or the facts at Snipe's home before

entering the Snipe residence because of the possibility of prank calls. We have previously rejected such a requirement on the grounds that it "would dramatically slow emergency response time, and would therefore be at odds with the purpose of the emergency doctrine—allow[ing] police to respond to emergency situations" in a timely manner. *United States v. Russell*, 436 F.3d 1086, 1092 (9th Cir. 2006) (internal quotation marks omitted). Indeed, in situations like the present, where the dispatcher is prevented from verifying the caller's identity because the number that the caller called in on does not populate, indicating either it was a blocked number or a cell number, Snipe's rule might prevent the police from responding at all. We appreciate the risk of a "false positive" emergency call and recognize that a show of police force in response to a prank call is a substantial intrusion on the lives of the prank's victims. It is the nature of our own assessments of what constitutes an emergency that the police will routinely be summoned for matters that are not, in some objective sense, real emergencies. We will not impose a duty of inquiry on the police to separate a true cry for help from a less deserving call for attention because the delay may cost lives that could have been saved by an immediate police response. The possibility that immediate police action will prevent injury or death outweighs the inconvenience we suffer when the police interrupt our ordinary routines in response to what turns out to be a non-emergency call.

**[5]** The facts the officers confronted when they arrived at the Snipe residence also underscore the entry's objective reasonableness. For example, when he arrived on the scene, Rodriguez, who is Snipe's neighbor, immediately noticed a vehicle that he did not recognize. Rodriguez also saw an individual he did not recognize running or walking into the residence. And, as Massey testified, the residence itself looked suspicious because the front door was ajar and he could see light coming from inside the house. Under these circumstances, the officers had an objectively reasonable basis to

believe there was an immediate need to protect others from serious harm when they entered the Snipe residence.

**[6]** The second prong of the exigent circumstances test considers whether the manner and scope of the officers' entry was reasonable. We hold this entry was reasonable. Much like the officers in *Brigham City*, Massey and Rodriguez knocked and announced their presence before entering the residence. When they saw an individual on a couch and others sitting at a table, they again identified themselves and said they were responding to an emergency call. In these circumstances, their manner of entry was reasonable. The subsequent scope of their search was also reasonable and confined to the areas of the house likely to include individuals in harm's way.

**[7]** Accordingly, because we find that the district court did not err in denying Snipe's motion to suppress, we affirm Snipe's conviction.

B. *Sentencing Appeal*

Snipe appeals his sentence on the ground that the district court erroneously sentenced him as a prohibited person pursuant to U.S.S.G. § 2K2.1(a)(6)(A). We review the district court's interpretation of the Sentencing Guidelines *de novo*. *United States v. Cantrell*, 433 F.3d 1269, 1279 (9th Cir. 2006). We review the district court's application of the Sentencing Guidelines to the facts of the case for abuse of discretion, and our inquiry is limited to determining whether the district court's decision was "reasonable." *Gall v. United States*, 522 U.S. ___, No. 06-7949, slip op. at 7 (Dec. 10, 2007). We review the district court's factual findings for clear error. *Cantrell*, 433 F.3d at 1279. Applying that standard, we affirm Snipe's sentence.

**[8]** Snipe was sentenced consistent with U.S.S.G. § 2K2.1(a)(6)(A), which provides that "if the defendant . . . was a prohibited person at the time the defendant committed

the instant offense," the defendant's base offense level shall be fourteen. A prohibited person is "any person defined in 18 U.S.C. § 922(g) or § 922(n)," U.S.S.G. § 2K2.1 cmt. n.3 (2004), which includes any person "who is an unlawful user of or addicted to any controlled substances," 18 U.S.C. § 922(g)(3). To successfully request an enhancement under this provision, "the government must prove . . . that the defendant took drugs with regularity, over an extended period of time, and contemporaneously with his purchase or possession of a firearm." *United States v. Prudy*, 264 F.3d 809, 813 (9th Cir. 2001); *see also United States v. Edmonds*, 348 F.3d 950, 953 (11th Cir. 2003) ("To support an offense enhancement under § 2K2.1(a)(6), the government does not have to prove the defendant was under the influence of a controlled substance at the time of his arrest. Instead, the government must show the defendant was an 'unlawful user' of a controlled substance during the same time period as the firearm possession."). For U.S.S.G. § 2K2.1(a)(6)(A) to apply, the government need only make that showing by a preponderance of the evidence. *See United States v. Charlesworth*, 217 F.3d 1155, 1158 (9th Cir. 2000) (holding that the government bears the burden of proving a defendant's base level offense by a preponderance of the evidence); *United States v. Howard*, 894 F.2d 1085, 1090 (9th Cir. 1990) (holding that the government should bear the burden of proof for any fact that the sentencing court would find necessary to determine the base offense level by a preponderance of the evidence).

**[9]** Furthermore, "the district court may rely on undisputed statements in the PSR at sentencing" to find that the government has met that standard, but "when a defendant raises objections to the PSR, the district court is obliged to resolve the factual dispute, *see* FED. R. CRIM. P. 32(i)(3)(B), and the government bears the burden of proof to establish the factual predicate for the court's base offense level determination." *United States v. Ameline*, 409 F.3d 1073, 1085-86 (9th Cir. 2005) (en banc); *see also United States v. Marin-Cuevas*, 147 F.3d 889, 895 (9th Cir. 1998) ("Because the only evidence

before the sentencing court was the Presentence Report, the preponderance of the evidence sustains the district court's finding."). In other words, when a defendant objects to a PSR's factual findings, "[t]he court may not simply rely on the factual statements in the PSR" to find that the government has carried its burden. *Ameline*, 409 F.3d at 1086.

**[10]** Relying on that language, Snipe asserts that the district court erred when it grounded its finding that he was a prohibited person entirely on the PSR's conclusion that he was a regular methamphetamine user since he maintained that he was not a prohibited person. Snipe's argument is without merit because *Ameline* holds that a district court may not rely exclusively on a PSR "[w]hen a defendant contests the *factual basis* of a PSR," 409 F.3d at 1086 (emphasis added), and Snipe made no objections to the factual findings in the PSR.**⁷** *See also United States v. Romero-Rendon*, 220 F.3d 1159, 1163 (9th Cir. 2000) (holding a district court did not err in grounding his sentencing findings entirely on the PSR because the defendant "never questioned [its] factual accuracy"). Indeed, while arguing before the district court that "there [was not] really any relation between the possession of the .22 rifle and his drug use" because he did not use the gun in connection with drug transactions (a point the attorney acknowledged was irrelevant), Snipe's attorney stated that he used drugs during the relevant period. Far from contesting Snipe's drug use, his attorney conceded "that [Snipe] around the time of the incident had a meth problem" and that it was "undisputed he had drug issue and drug problems" during the relevant period. Consequently, because Snipe conceded the factual basis of the PSR, the district court did not err in basing its conclusion that Snipe was a prohibited person on the PSR.

---

**⁷**The PSR grounded its conclusion that Snipe was a regular user of methamphetamine on Snipe's own statements to police that he was a user of controlled substances, "he had probably used drugs a 'couple of days before' [January 1, 2005]," he began regular usage at 18 or 19, he was a heavy user of methamphetamine in 2004, he used about three times per week throughout 2004, and he had spent $10,000 on methamphetamine.

Snipe's other argument that his sentence should be overturned—that "the disputed facts proving he is an 'unlawful user' should [have] go[ne] to a jury to decide under the recent decision in *United States v. Booker*,"—also lacks merit for essentially the same reason. Snipe never disputed the facts underlying his sentence; he conceded them. Consequently, we reject Snipe's second argument and affirm his sentence.

## III

For the forgoing reasons, Snipe's conviction and sentence are **AFFIRMED.**