# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

BRUCE HOPKINS,
    *Plaintiff-Appellee,*

v.

A. BONVICINO, Badge No. 1140, individually & in his official capacity as a San Carlos Police Officer; DAVID BUELOW individually & in his official capacity as a San Carlos Police Officer; NICK NGUYEN, Badge No. 1141, individually in his official capacity as a San Carlos Police Officer; CITY OF SAN CARLOS,
    *Defendants-Appellants.*

No. 07-15102

D.C. No.
CV-05-02932-JSW

OPINION

Appeal from the United States District Court
for the Northern District of California
Jeffrey S. White, District Judge, Presiding

Argued and Submitted
October 20, 2008—San Francisco, California

Filed July 16, 2009

Before: Mary M. Schroeder, Dorothy W. Nelson, and
Stephen Reinhardt, Circuit Judges.

Opinion by Judge Reinhardt

9023

---

**COUNSEL**

Anthony Boskovich, Boskovich Law Office, San Jose, California, for the plaintiff-appellee.

Todd H. Master, Howard Rome Martin & Ridley, Redwood City, California, for the defendants-appellants.

---

**OPINION**

REINHARDT, Circuit Judge:

On August 22, 2003, two San Carlos Police Officers broke into Bruce Hopkins' home. They did not have a warrant, nor did they have probable cause. All that they had was a statement from a third-party that Hopkins had been involved in an

extremely minor traffic incident, an incident so minor that it did not cause as much as a scratch on either of the vehicles involved, and that he appeared to have been drinking. Based on this information, the officers broke into Hopkins' home with their flashlights shining and their guns drawn. When they found Hopkins, they handcuffed him, removed him from his house, and placed him under arrest.

The officers' explanation for their warrantless entry is both simple and audacious: They claim that, after hearing that Hopkins had the smell of alcohol on his breath, they feared he was on the brink of a diabetic coma and broke into his house in order to offer medical assistance. According to one officer's deposition testimony, they entered with their guns drawn because individuals suffering from diabetic emergencies "may sometimes be confused" and can be "combative." Apparently, in the officer's view, someone suffering from such a medical emergency may need to be deterred by deadly force. Hopkins, however, was neither confused nor combative because he was not suffering from a diabetic emergency — he was lying in his bedroom watching television, which is where the officers found him. Yet, after the officers discovered that he was perfectly healthy and non-comatose, they did not say "we're glad to see that you are safe, sir; we'll be on our way now." They did not say, "Sorry for the disturbance and for damaging your property." No, instead they handcuffed Hopkins at gunpoint, removed him from his home, placed him under arrest, and brought him to the San Mateo County jail for the final chapter in the case of the nonexistent diabetes.

Hopkins sued the two officers who broke into his house, their colleague who waited outside, and the City of San Carlos under 42 U.S.C. § 1983. He asserts three causes of action: unlawful warrantless entry of a home, unlawful arrest without probable cause, and excessive use of force. The defendants jointly moved for summary judgment on all counts — the officers asserting a qualified immunity defense and the City arguing that it should not be held liable under *Monell v. N.Y.*

*City Department of Social Services*, 436 U.S. 658 (1978). The district court denied the motion, and the defendant-officers now appeal.[1] Because "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed," *Payton v. New York*, 445 U.S. 573, 585 (1980) (quoting *United States v. U.S. Dist. Court*, 407 U.S. 297, 313 (1972)), and because the officers' conduct here unequivocally violated Hopkins' clearly established constitutional rights, we affirm the denial of summary judgment with respect to Officers Bonvicino and Buelow, although we hold that their colleague, Officer Nguyen, is entitled to qualified immunity.

## I.    Factual and Procedural Background

On a Friday evening in late August of 2003, Bruce Hopkins finished his shift at work and went to the local American Legion Hall in San Carlos, California, for a drink.[2] After having a few beers he left to drive home. While en route, he was involved in a minor traffic incident with a car driven by Ms. Waheeda Talib. Both Talib and Hopkins agree that they each got out of their cars to inspect the vehicles for damage.[3] According to Hopkins, the two agreed that there was no damage and he continued on his way home. According to later police reports of the incident, Talib claimed that after exiting his car Hopkins denied responsibility for the incident and simply drove away.

Despite minor discrepancies in the details of the traffic

---

[1]The denial of summary judgment with respect to the City of San Carlos is not before us.

[2]Because this case comes to us on defendants' motion for summary judgment, we take all facts in the light most favorable to Hopkins, the nonmoving party.

[3]Talib did not testify in any depositions for this lawsuit nor did she submit any affidavits or responses to interrogatories. Her statements are drawn from the various police reports completed by the defendants in this case.

incident's immediate aftermath, the parties agree that Talib followed Hopkins to his home without Hopkins being aware that she was behind him. When Hopkins arrived home and left his car, Talib confronted him about the incident and accused him of being intoxicated. Talib later told the defendant-officers that she suspected Hopkins was under the influence of alcohol because when she spoke with him in front of his residence she smelled alcohol on his breath and observed that he seemed impaired and had difficulty walking. During her confrontation with Hopkins, Talib spoke on her cell phone. Fearing that she was either calling "her husband to come down there and beat [him] up or [that] she was calling the cops," Hopkins entered his house "as quick as he could." His exchange with Talib on his front lawn lasted no longer than a minute to a minute and a half. Once inside his home, Hopkins went to his bedroom in the basement to watch television.

Talib remained outside on Hopkins' lawn and called the police. She told the dispatcher that she had been involved in a hit-and-run accident, that she followed the driver to his house, and that she suspected he had been drinking. Shortly thereafter, San Carlos police officers Armand Bonvicino and Nick Nguyen arrived at Hopkins' residence. Officer Bonvicino, the "primary officer" for the call, asked Talib if she needed medical assistance; she said she did not. Talib then proceeded to tell Bonvicino and Nguyen about the traffic incident and reported that Hopkins appeared intoxicated when he got out of his vehicle. Officer Bonvicino walked to the front door of Hopkins' house, knocked loudly, and announced himself as a police officer multiple times through an open window. He did not receive a response.

Officer Bonvicino then returned to the front lawn and conferred with Officer Nguyen and with Officer David Buelow, who had since arrived at the scene.[4] While Officer Nguyen

---

[4]Officer Buelow had been Officer Bonvicino and Officer Nguyen's field training officer when they were both police department trainees.

continued to interview Talib, Officers Bonvicino and Buelow decided to walk to the side of the house in order to attempt to contact Hopkins through a side door. The side entrance to Hopkins' home had a screen door, which was closed and locked, and a solid door behind the screen, which was open. After knocking on the screen door and receiving no response, Officers Bonvicino and Buelow discussed with each other possible explanations for Hopkins' not answering. Among the explanations they came up with was the possibility that Hopkins was on the brink of a diabetic coma. As both officers later explained in their declarations and depositions, they had been trained that what a layperson might describe as the odor of alcohol on someone's breath could actually be the "fruity" smell associated with a diabetic emergency. With this potential medical emergency in mind, Officer Bonvicino loudly announced through the screen that he and Officer Buelow would be making an entry into the house to check on Hopkins' welfare.

Officer Bonvicino cut a hole in the screen, reached in, and unlocked the door. He and Officer Buelow then entered the residence with their flashlights on and their guns drawn. Inside, the officers searched for Hopkins in the areas of his home in which a person might be found. They discovered him lying on the floor in his bedroom, which was a converted garage space. According to Hopkins, he had never heard the officers' knocking and was terrified when they entered with their guns drawn and flashlights shining; he fell off the bed as they were coming down the stairs into his room. The officers asked Hopkins to get up, show his hands, and move toward them, which he did. At this point, Officer Bonvicino holstered his sidearm because, in his words, Hopkins "was not a threat to officer safety." Officer Buelow, however, continued to point his gun at Hopkins. Hopkins was then handcuffed and taken outside.

While Officers Bonvicino and Buelow were inside Hopkins' home, Officer Nguyen had been interviewing Talib and

taking pictures of her and Hopkins' cars. Once Hopkins was brought outside, Talib positively identified him as the driver of the vehicle that had bumped into hers. After Officer Nguyen explained the mechanics of a citizen's arrest to her and provided her with a citizen's arrest form printed by the San Carlos police department, Talib executed a citizen's arrest of Hopkins for hit-and-run and asked the officers to take him into custody. The officers took Hopkins to the San Carlos Police Department. He was later charged with hit-and-run and driving under the influence and transferred to San Mateo County Jail. Hopkins' criminal charges were quickly dropped once the judge in San Mateo Superior Court granted his motion to suppress the evidence against him on the ground that the officers' entry into his home was illegal.

After his criminal case concluded, Hopkins filed a civil complaint under 42 U.S.C. § 1983 in the Northern District of California, alleging, *inter alia*, that the officers violated his civil rights by entering his house without a warrant, arresting him without probable cause, and using excessive force. The defendant-officers filed a joint motion for summary judgment, contending that they did not violate Hopkins' constitutional rights, and, even if they did, that they are entitled to qualified immunity. The district court granted the motion with respect to Officer Nguyen's liability for excessive force, but otherwise denied the motion in all respects.

## II.  Standard of Review

A district court's decision denying summary judgment on the ground of qualified immunity is reviewed *de novo. See, e.g.*, *Bingham v. City of Manhattan Beach*, 341 F.3d 939, 945 (9th Cir. 2003). Qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). Because the defense provides immunity from suit, not just a defense from liability, the denial of a motion for summary judgment predicated on quali-

fied immunity is an immediately appealable collateral order. *Id.* at 528-30.

The qualified immunity analysis involves two separate steps. First, the court determines whether the facts "show the officer's conduct violated a constitutional right." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). If the alleged conduct did not violate a constitutional right, then the defendants are entitled to immunity and the claim must be dismissed. However, if the alleged conduct did violate such a right, then the court must determine "whether the right was clearly established" at the time of the alleged unlawful action. *Id.* A right is clearly established if "a reasonable official would understand that what he is doing violates that right." *Id.* at 202. If the right is not clearly established, then the officer is entitled to qualified immunity. While the order in which these questions are addressed is left to the court's "sound discretion," "it is often beneficial" to perform the analysis in the sequence outlined above. *Pearson v. Callahan*, 129 S.Ct. 808, 818 (2009). Of course, where a claim of qualified immunity is to be denied, both questions must be answered.

When determining whether there are any genuine issues of material fact at the summary judgment stage, the court must take all facts in the light most favorable to the non-moving party. In the context of qualified immunity, determinations that turn on questions of law, such as whether the officers had probable cause or reasonable suspicion to support their actions, are appropriately decided by the court. *Act Up!/Portland v. Bagley*, 988 F.2d 868, 873 (9th Cir. 1993). However, a trial court should not grant summary judgment when there is a genuine dispute as to "the facts and circumstances within an officer's knowledge" or "what the officer and claimant did or failed to do." *Id.*

## III.   Warrantless Entry

**[1]** Hopkins' first claim is that his constitutional rights were violated when, acting under color of state law, Officers Bon-

vicino and Buelow entered his house without a warrant in violation of the Fourth Amendment. The Fourth Amendment provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." U.S. CONST. amend. IV. "[S]earches and seizures inside a home without a warrant are presumptively unreasonable." *United States v. Martinez*, 406 F.3d 1160, 1163 (9th Cir. 2005) (internal quotation marks omitted) (quoting *Payton*, 445 U.S. at 586).

**[2]** The presumption, however, is not irrebuttable. "There are two general exceptions to the warrant requirement for home searches: exigency and emergency." *Id.* at 1164. These exceptions are "narrow" and their boundaries are "rigorously guarded" to prevent any expansion that would unduly interfere with the sanctity of the home. *United States v. Stafford*, 416 F.3d 1068, 1073 (9th Cir. 2005). In general, the difference between the two exceptions is this: The "emergency" exception stems from the police officers' "community caretaking function" and allows them "to respond to emergency situations" that threaten life or limb; this exception does "*not* [derive from] police officers' function as criminal investigators." *United States v. Cervantes*, 219 F.3d 882, 889 (9th Cir. 2000) (emphasis added). By contrast, the "exigency" exception does derive from the police officers' investigatory function; it allows them to enter a home without a warrant if they have both probable cause to believe that a crime has been or is being committed and a reasonable belief that their entry is "necessary to prevent . . . the destruction of relevant evidence, the escape of the suspect, or some other consequence improperly frustrating legitimate law enforcement efforts." *United States v. McConney*, 728 F.2d 1195, 1199 (9th Cir. 1984) (en banc).

Here, the defendant-officers attempt to justify their warrantless entry into Hopkins' home primarily on the basis of the emergency exception, but rely in the alternative on the exigency exception. We address these defenses in turn.

## A. The Emergency Exception

**[3]** This court has clearly held that a police officer may not enter a home to investigate a medical emergency or other immediate risk to life or limb unless he has "reasonable grounds" to believe an emergency is at hand and that his immediate attention is required. *Cervantes*, 219 F.3d at 888. Although the test we announced in *United States v. Cervantes*, 219 F.3d 882 (9th Cir. 2000), was altered by the Supreme Court in *Brigham City v. Stuart*, 547 U.S. 398 (2006), the reasonable grounds prong "survives *Brigham City*, and indeed remains the core of the . . . analysis." *United States v. Snipe*, 515 F.3d 947, 951 (9th Cir. 2008).[5] Under this prong, "law enforcement must have an *objectively reasonable basis* for concluding that there is an immediate need to protect others

---

[5]In *Cervantes*, we adopted a three part test for analyzing whether a warrantless entry is valid under the emergency exception. We held:

> (1) The police must have reasonable grounds to believe that there is an emergency at hand and an immediate need for their assistance for the protection of life or property. (2) The search must not be primarily motivated by intent to arrest and seize evidence. (3) There must be some reasonable basis, approximating probable cause, to associate the emergency with the area or place to be searched.

219 F.3d at 888. In *Brigham*, the Supreme Court intervened and altered the analysis by abrogating the second prong of the *Cervantes* test. The Court held that "[a]n action is 'reasonable' under the Fourth Amendment, regardless of the individual officer's state of mind, 'as long as the circumstances, viewed *objectively*, justify [the] action.' " *Brigham City*, 547 U.S. at 404 (emphasis and second alteration in original) (quoting *Scott v. United States*, 436 U.S. 128, 138 (1978)).

We then construed *Brigham* as requiring that officers executing a warrantless entry of a home "ha[ve] an objectively reasonable basis for concluding that there [i]s an immediate need to protect others or themselves from serious harm; and [that] the search's scope and manner [a]re reasonable to meet the need." *Snipe*, 515 F.3d at 952. This formulation, when combined with the third prong of *Cervantes*, which was unaffected by either *Brigham* or *Snipe*, states our circuit's current law governing the emergency exception.

or themselves from serious harm." *Id.* at 951-52 (emphasis added). This "reasonable basis" requirement, clearly established by *Cervantes* in 2000 and reaffirmed by *Snipe* in 2008, is the core principle governing the officers' conduct in the present appeal.

We must "judge whether or not the emergency exception applies in any given situation based on the totality of the circumstances, and, as with other exceptions to the warrant requirement, the Government bears the burden of demonstrating that the search at issue meets these parameters." *United States v. Stafford*, 416 F.3d 1068, 1074 (9th Cir. 2005). Here, the defendant-officers contend that two possible medical emergencies justified their warrantless entry.

[4] The officers' first argument is that because they were responding to a reported automobile accident they were authorized to enter Hopkins' home to see if he was injured as a result of that incident. However, taking the alleged facts in the light most favorable to Hopkins, the police officers were aware that the purported accident did not cause so much as a scratch to either of the cars involved, as is confirmed by the photographs of the vehicles taken that evening by Officer Nguyen. Furthermore, after speaking with Talib — the woman who called the police and spoke with them before they entered Hopkins' home, who was involved in the so-called "accident," and who observed Hopkins exit his car both at the scene of the incident and back at his home — the officers, in their own words, learned "*nothing*" regarding the nature of the accident that "caused [them] to be concerned for Mr. Hopkins' medical condition." In short, there was absolutely no indication that the minor bump between the two cars was at all serious or that it had caused any type of medical emergency. Accordingly, the mere fact that the officers were responding to a minor "hit-and-run" cannot justify their warrantless entry into Hopkins' home.

**[5]** Perhaps aware of the tenuous nature of this first argument, the officers put greater weight on their second purported medical emergency: the argument that they had reason to believe that Hopkins was suffering from or on the brink of a diabetic coma. This claim, however, is equally baseless, and, if permitted to serve as the basis for the warrantless home intrusion, would allow police officers to ignore the Fourth Amendment almost at will. No one disputes that a diabetic coma is a medical emergency, which it clearly is. Rather, the question before us is whether Officers Bonvicino and Buelow had an "objectively reasonable basis" to suspect that Hopkins was in fact *suffering* from a diabetic coma. *Snipe*, 515 F.3d at 951. Taking the facts in the light most favorable to Hopkins, the only information the officers possessed that would support such a conclusion is as follows: (1) Talib said she smelled alcohol on Hopkins' breath; (2) Talib described Hopkins as appearing slightly intoxicated; and (3) Hopkins did not respond when the officers knocked on his door. The officers argue that, because an individual suffering from the initial phases of a diabetic coma can, to an untrained observer, appear intoxicated and can have a "sickly sweet" or "fruity" odor on his breath that a layperson might confuse with the smell of alcohol, their fear of a diabetic emergency was reasonable. This contention is unsupportable: the mere suggestion that someone has a smell resembling alcohol on his breath and appears slightly intoxicated does not create "reasonable grounds" to suspect a diabetic emergency sufficient to justify warrantless entry into a home. If it did, then, as the officers acknowledged at oral argument, *any time* the police receive information from a layperson that someone inside a home has the appearance of a person who has consumed alcohol the police will be authorized to enter that home without a warrant. This result would expand the "narrow[,] . . . rigorously guarded exception[ ] to th[e] warrant requirement" beyond all recognition, and simply cannot be the law. *Stafford*, 416 F.3d at 1073.[6]

---

[6]The officers' contention is especially troubling in light of the large percentage of police activity that involves some report of alcohol consump-

**[6]** As this court has made clear, "if [police officers] otherwise lack reasonable grounds to believe there is an emergency," they must "take additional steps to determine whether there [i]s an emergency that justifie[s] entry in the first place." *United States v. Russell*, 436 F.3d 1086, 1092 (9th Cir. 2006). Here, the officers did not take any such additional steps. They did not, as in *Martin v. City of Oceanside*, 360 F.3d 1078, 1080 (9th Cir. 2004), attempt to reach Hopkins by telephone in order to check on his welfare. They did not ask Talib for more information, such as whether she observed Hopkins wearing a medical alert bracelet or whether the odor she smelled on his breath was "fruity," "sickly sweet," or otherwise distinguishable from the typical smell of alcohol on a person's breath. The mere fact that Hopkins did not answer the door cannot tip the balance in the officers' favor, since nothing requires an individual to answer the door in response to a police officer's knocking. *United States v. Washington*, 387 F.3d 1060, 1070-71 (9th Cir. 2004). We do not dispute that the police officers in this case had reasonable grounds to believe that Hopkins had been *drinking*, but, without obtaining more information, they could not reasonably have believed that he needed immediate medical attention due to a diabetic emergency.[7]

**[7]** Every case in this circuit that has upheld a warrantless search of a home under the emergency exception has involved

---

tion. *See generally* BUREAU OF JUSTICE STATISTICS, ALCOHOL AND CRIME (1998) (reporting high correlation between alcohol involvement and suspected or actual criminal conduct), *available at* http://www.ojp.usdoj.gov/bjs/pub/pdf/ac.pdf.

[7]We also note that under *United States v. Snipe*, *see supra* note 5, we "must consider the officers' manner of entry." 515 F.3d at 952. Here, the officers entered the house with their guns drawn, a tactic that hardly seems consistent with a response to a medical emergency where the victim is expected to be comatose or quasi-comatose. Surely paramedics or emergency medical technicians responding to diabetic emergencies do not do so with guns drawn.

significantly more evidence of an emergency than is present
here. In *Cervantes* itself, the searching officer, who had been
trained to recognize the smell of highly combustible fumes
associated with methamphetamine production, personally
smelled those fumes emanating from an apartment after
responding to a call from the fire department. 219 F.3d at
885-86. In *United States v. Bradley*, a mother who had just
been arrested for possessing methamphetamine told the police
that her nine-year old son was home alone in the middle of the
night, a situation that we held "requir[ed] immediate police
assistance." 321 F.3d 1212, 1215 (9th Cir. 2003). In *Martin
v. City of Oceanside*, officers entered a house in response to
a phone call from a father who called the police "with an
urgent request to check on the safety of his daughter . . .
[whom he] had been unable to reach . . . for several days."
360 F.3d at 1080. In *United States v. Martinez*, officers
responding to a domestic violence call found a woman crying
on the front lawn of a house and heard a man shouting from
inside; in the unique context of "a domestic abuse call, [in
which] 'violence may be lurking and explode with little warn-
ing,' " we upheld the officers' warrantless entry to speak to
the screaming and potentially injured male resident. 406 F.3d
at 1162-64 (quoting *Fletcher v. Clinton*, 196 F.3d 41, 50 (1st
Cir. 1999)). In *United States v. Stafford*, we upheld a warrant-
less entry after a building maintenance man reported to police
that the walls of an apartment were covered in blood and
feces and that he smelled what he thought was a dead body.
416 F.3d 1068, 1071-73 (9th Cir. 2005). In *United States v.
Russell*, we upheld a warrantless entry where a series of con-
fused 911 calls suggested that one individual had shot another
inside a house and that the shooter was still inside when the
officers arrived. 436 F.3d 1086, 1090 (9th Cir. 2006). Finally,
in *United States v. Snipe*, the police entered a home in
response to a 911 call in which a "very hysterical sounding"
caller "screamed . . . [g]et the cops here now." 515 F.3d at
949 (alteration in original).

[8] A statement that someone's breath smelled like alcohol
is not even remotely comparable to the information we have

previously deemed to constitute "reasonable grounds" for suspecting a medical or other life-threatening emergency. It is simply inconceivable that a "reasonable officer" presented with the information that Talib conveyed to Officers Bonvicino and Buelow could conclude, on the basis of that information alone, that he had "an objectively reasonable basis" to suspect a medical emergency was at hand. Yet, as Officer Buelow acknowledged in his deposition, he believed that, hypothetically, any time an officer receives a report of alcohol consumption, that officer would, in his discretion, have reasonable grounds to enter a home without a warrant in order to investigate a diabetic emergency. Whatever this understanding of the Fourth Amendment might be called, it cannot be called "objectively reasonable." Thus, the emergency exception cannot justify the warrantless entry into Hopkins' home.

## B.   The Exigency Exception

[9] The officers' alternative argument is that, although they claim to have entered Hopkins' house in response to a medical emergency, a reasonable officer would have been justified in entering the building in order to investigate a crime under the "exigent circumstances" exception. "[W]hen the government relies on the exigent circumstances exception, it . . . must satisfy two requirements: first, the government must prove that the officer had probable cause to search the house; and second, the government must prove that exigent circumstances justified the warrantless intrusion." *United States v. Johnson*, 256 F.3d 895, 905 (9th Cir. 2001) (en banc). "Exigent circumstances" can include "the destruction of relevant evidence." *United States v. McConney*, 728 F.2d 1195, 1199 (9th Cir. 1984) (en banc). Here, the officers claim that their entry was justified because a reasonable officer would have had probable cause to believe Hopkins had been driving under the influence of alcohol in violation of CAL. VEH. CODE § 23152, and that an immediate entry was necessary in order

to obtain evidence of his blood alcohol content before the alcohol in his bloodstream metabolized.

We address the probable cause and exigent circumstances requirements in turn.

### 1.    Probable Cause

**[10]** As the officers concede, the only crime for which they can claim to have had probable cause to enter Hopkins' residence is driving under the influence of alcohol, a violation of CAL. VEH. CODE § 23152.[8] "Officers have probable cause for a search when 'the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found.' " *United States v. Henderson*, 241 F.3d 638, 648 (9th Cir. 2000) (quoting *Ornelas v. United States*, 517 U.S. 690, 696 (1996)).

**[11]** This court has held that "[i]n establishing probable cause, officers may not solely rely on the claim of a citizen witness that [s]he was a victim of a crime, but must independently investigate the basis of the witness' knowledge or interview other witnesses." *Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 925 (9th Cir. 2001) (citing *Fuller v. M.G. Jewelry*, 950 F.2d 1437, 1444 (9th Cir. 1991) ("[P]olice officers ha[ve] a duty to conduct an investigation into the basis of [a] witness' report")). In violation of the rule set forth in *Arpin* and *Fuller*, the officers here entered Hopkins' home based *solely* on the information they obtained

---

[8]The officers expressly waived below any argument that investigation of a potential hit-and-run could have justified their warrantless entry. They also acknowledge in their briefs on appeal that Talib's citizen's arrest, discussed *infra* Part IV.B, "is not a basis for [their] warrantless entry into the residence." And so they must, as their own police reports indicate that Talib did not authorize a citizen's arrest until *after* the officers entered Hopkins' home. Even if a stand-alone citizen's arrest could justify a warrantless home entry — a dubious proposition, see infra Part IV.B — the sequence of events here does not support such a justification.

from Talib — namely, that she had been involved in an extremely minor car accident with Hopkins, that she smelled alcohol on his breath, and that he appeared intoxicated. The officers did not inspect Hopkins' car to see if the hood was still warm, *cf. People v. Thompson*, 135 P.3d 3, 5-8 (Cal. 2006), which would have corroborated Talib's statement that the car had recently been driven, nor did they inspect the vehicle for any evidence of reckless driving or of alcohol consumption, such as open containers or an alcoholic odor. They did not ask Talib any questions in order to gain information beyond her cursory and conclusory statements, such as whether she observed Hopkins driving erratically or at an abnormal speed. In short, the officers obtained no information whatsoever beyond Talib's brief statement. Under *Arpin* and *Fuller*, these statements from a witness, without further investigation by the police, are insufficient to support probable cause.[9]

## 2.    Exigent Circumstances

Even if the officers had probable cause that Hopkins had been driving under the influence (and even if that would have been sufficient for entry into his home pursuant to a warrant), more is required to justify a *warrantless* entry into his house. The Fourth Amendment requires that there be exigent circumstances for a warrantless entry. *See, e.g.*, *Johnson*, 256 F.3d at 907-09. The defendants contend that a reasonable officer would have been justified in entering Hopkins home in order

---

[9]We need not decide whether even if the officers had obtained independent evidence supporting Talib's allegations, the "probable cause" this information provided would have been sufficient to justify the issuance of a warrant to search Hopkins' home for evidence of the minor misdemeanor violation at issue here. Whether a home, or the homeowner in his home, may be searched pursuant to a warrant for evidence of a minor motor vehicle violation involving neither personal injury nor property damage raises a serious question in our minds and would require the balancing of the interests of the homeowner in the right to privacy in his home versus the state's interest in searching homes for evidence of such minor criminal violations.

to obtain evidence of his blood-alcohol ratio, and that the rapid metabolizing of the alcohol in his blood would constitute exigent circumstances. This argument would seem to be directly foreclosed by *Welsh v. Wisconsin*, a case in which the United States Supreme Court held that "a warrantless home arrest cannot be upheld simply because evidence of the petitioner's blood-alcohol level might have dissipated while the police obtained a warrant." 466 U.S. 740, 754 (1984); *see also id.* at 748 (holding that the same analysis applies to "agents of the government who seek to enter the home for purposes of search or arrest"). *Welsh* involved an investigation of alleged misdemeanor drunk driving, just as did Hopkins' case. However, relying on *People v. Thompson*, 135 P.3d 3 (Cal. 2006), a California Supreme Court decision, the officers argue that *Welsh* is distinguishable because the Wisconsin DUI law at issue in that case was a "nonjailable" offense, whereas in California DUI is a misdemeanor punishable by up to six months in county jail.

**[12]** The appellants are correct that three years after they broke into Hopkins' home the California Supreme Court sought to distinguish *Welsh* on the basis of a difference between jailable and nonjailable offenses. *See id.* at 9 ("We therefore believe *Welsh* was limited to Wisconsin's 'amazing' decision to classify DUI as a civil nonjailable offense . . . ."). However, this is *not* the distinction that the United States Supreme Court drew in *Welsh*, nor is it the distinction that this circuit has repeatedly emphasized in its own exigency-exception decisions. To the contrary, in *Welsh* the Supreme Court held that the exigency analysis must turn on "the *gravity* of the underlying offense," 466 U.S. at 753 (emphasis added), not its status as "jailable" or "nonjailable." The Court specifically said that a finding of exigent circumstances is particularly inappropriate "when the underlying offense . . . is realtively minor," *id.* at 750 (emphasis added), and cited favorably "those courts addressing the issue [that] have refused to permit warrantless home arrests for *nonfelonious* crimes." *Id.* at 752 (emphasis added). The Supreme

Court expressly did *not* limit its holding in *Welsh* to nonjailable offenses,[10] *see id.* at 753; to the contrary, it suggested that exigent circumstances can rarely, if ever, support entry into a home to investigate or arrest someone for a misdemeanor offense.

[13] Building on the felony/misdemeanor distinction discussed in *Welsh*, this circuit has clearly held that "an exigency related to a misdemeanor will seldom, if ever, justify a warrantless entry into the home." *LaLonde v. County of Riverside*, 204 F.3d 947, 956 (9th Cir. 2000) (citing *Welsh*, 466 U.S. at 752-53). In *United States v. Johnson*, we analyzed en banc a warrantless search of a home and noted that "in situations where the underlying offense is only a misdemeanor, law enforcement must yield to the Fourth Amendment in all but the 'rarest' cases." 256 F.3d 895, 909 n.6 (9th Cir. 2001) (en banc) (quoting *Welsh*, 466 U.S. at 753). Because *Johnson* and *LaLonde* relied on and directly cited *Welsh* for the proposition that investigation of a misdemeanor will rarely, if ever, support exigent circumstances, *see id.* at 908, it is clear that, whatever "rare" circumstances might justify a warrantless home entry to investigate a misdemeanor, misdemeanor driving while under the influence, the very offense at issue in *Welsh* and cited by *Johnson*, does not fall within that very narrow exception. Here, the offense that the officers claim supports their warrantless entry is indisputably a misdemeanor, *see* CAL. VEH. CODE §§ 23152, 23536; CAL. PENAL CODE § 17 (2008) (defining misdemeanor). More important, it is the precise offense that the Supreme Court held insufficient to justify a warrantless entry in *Welsh*. Accordingly, even were there probable cause that Hopkins had in fact been driving under the influence, a warrantless entry into his home was unjustified.

---

[10]In fact, the offense for which Welsh himself was ultimately charged *was* a jailable offense under Wisconsin law, although the offending officers did not know this at the time they entered his home. *See Welsh*, 466 U.S. at 746 n.6.

The fact that the California Supreme Court expressed its disagreement with the United States Supreme Court several years after the officers broke into Hopkins' home and that it took a different view of the Fourth Amendment than this circuit and the United States Supreme Court does not alter our conclusion in this case. It is the federal courts that are the final arbiters of federal constitutional rights, not the state courts. *See, e.g.*, *Bennett v. Mueller*, 322 F.3d 573, 582 (9th Cir. 2003) ("[S]tate courts will not be the final arbiters of important issues under the federal constitution." (quoting *Minnesota v. Nat'l Tea Co.*, 309 U.S. 551, 557 (1940))). This court's precedents make clear that a warrantless home entry to obtain evidence of a misdemeanor offense is "seldom, if ever" constitutional, and that it was certainly unconstitutional here. *LaLonde*, 204 F.3d at 956.

Accordingly, the exigency exception is inapplicable here for two independent reasons — absence of probable cause and absence of exigent circumstances — either of which is sufficient to compel our holding that the officers' forced entry into Hopkins' home violated his Fourth Amendment rights.

## C.   Officer Nguyen

**[14]** To this point, we have discussed the conduct of Officer Buelow and Officer Bonvicino, but not the conduct of Officer Nguyen, who remained outside with Talib while his colleagues broke into Hopkins home. The district court granted Officer Nguyen's motion for summary judgment with respect to Hopkins' claim of excessive force, but denied the motion with respect to the unlawful entry claim. Hopkins argues that Officer Nguyen should not enjoy qualified immunity on the warrantless-entry claim because Nguyen was an "integral participant" in the search. This argument, however, misunderstands our circuit precedent. In *Chuman v. Wright*, 76 F.3d 292 (9th Cir. 1996), we rejected "the 'team effort' standard [that] allows the jury to lump all the defendants together, rather than require it to base each individual's liabil-

ity on his own conduct." 76 F.3d at 295. In that case, we held that a police officer's "[b]eing a mere bystander [to his colleagues' conduct] was insufficient" to support § 1983 liability. *Id.* at 294.

**[15]** Hopkins seeks to distinguish *Chuman* by relying on the "integral participant" rule, which, as its name suggests, extends liability to those actors who were integral participants in the constitutional violation, even if they did not directly engage in the unconstitutional conduct themselves. However, this rule requires more participation and support on the part of a particular defendant than the undisputed facts in this case show Officer Nguyen to have provided. Under the integral participant rule, "an officer who does not enter an apartment, but *stands at the door, armed with his gun*, while other officers conduct the search, can . . . be a 'full, active participant' in the search" and therefore can be subject to § 1983 liability. *Boyd v. Benton County*, 374 F.3d 773, 780 (9th Cir. 2004) (emphasis added). Each of the cases cited in *Boyd* in which the "integral participant" rule was deemed satisfied involved officers who "provided armed backup during an unconstitutional search." *Id.* While the "integral participant" rule may extend liability beyond simply those officers who provide "armed backup," it is clear that an officer who waits in the front yard interviewing a witness and does not participate in the unconstitutional search in any fashion cannot be held liable under *Chuman*.

**[16]** Hopkins argues that Officer Nguyen is not entitled to qualified immunity because he was part of a conversation in which the three officers formed a "plan of action" to enter the house. However, the undisputed facts show that the decision to enter Hopkins' home was not made or discussed during that conversation, but rather was made in a separate conversation between Officers Buelow and Bonvicino at the side entrance to Hopkins' house.[11] Accordingly, Officer Nguyen partici-

---

[11]We also note that there is no allegation that Officer Nguyen either ordered the unconstitutional search or directed it from afar. To the con-

pated in neither the planning nor the execution of the unlawful search. We therefore reverse the district court with respect to Officer Nguyen's liability and hold that he is entitled to qualified immunity on the unlawful search claim.

## D.   Clearly Established Law

Because Officer Nguyen did not commit a constitutional violation with respect to Hopkins' warrantless-entry claim, we need not proceed to the second step of the qualified-immunity analysis with respect to him. However, because both Officer Bonvicino and Officer Buelow did violate Hopkins' Fourth Amendment rights by forcibly entering his home without a warrant in the absence of any valid justification under either the emergency or exigency exceptions, in order to determine whether they are entitled to qualified immunity on this claim we must examine whether the contours of those two exceptions were clearly established in 2003 when they engaged in the conduct at issue.

[17] To begin with the emergency exception, our decision in *United States v. Cervantes* clearly establishes that at the time of the officers' warrantless forced entry into Hopkins' home "[t]he police [were required to] have reasonable grounds to believe that there is an emergency at hand and an immediate need for their assistance." 219 F.3d at 888. That opinion, which set forth the governing legal standard, was

---

trary, the record is clear that Officer Bonvicino was the "primary agent" on the scene. It is also clear that Officer Buelow was the most senior officer, as he had been both Officer Bonvicino's and Officer Nguyen's Field Training Officer. Thus, the rule that "[a] supervisor may be held liable under § 1983 'if he or she was personally involved in the constitutional deprivation or a sufficient causal connection exists between the supervisor's unlawful conduct and the constitutional violation' " does not apply to Officer Nguyen. *Lolli v. County of Orange*, 351 F.3d 410, 418 (9th Cir. 2003) (quoting *Jackson v. City of Bremerton*, 268 F.3d 646, 653 (9th Cir. 2001)).

decided in June of 2000, over three years before Officers Buelow and Bonvicino engaged in their warrantless entry. Our previous discussion, *see supra* Part III.A, makes clear that it was patently *unreasonable* for Buelow and Bonvicino to believe that a diabetic emergency was at hand based simply on Talib's description of Hopkins as slightly inebriated. Our qualified immunity analysis, however, presents a somewhat different question than whether there were "reasonable grounds to believe that there [wa]s an emergency at hand;" *id*; in determining whether the officers' conduct violated clearly established law, we must ask whether in 2003 a *"reasonable officer" would have known* that he lacked "reasonable grounds to believe that there [wa]s an emergency at hand." *See Saucier v. Katz*, 533 U.S. 194, 202 (2001); *Robinson v. Solano County*, 278 F.3d 1007, 1012 (9th Cir. 2002) (en banc) ("[T]he standard of reasonableness for purposes of qualified immunity is distinct from the standard of reasonableness embodied in the Fourth Amendment."). Here, we unhesitatingly conclude that a reasonable officer would indeed have known that the emergency exception to the Fourth Amendment would not encompass a warrantless entry into a home based solely on statements from a third party that an individual inside the home appeared inebriated prior to entering the residence. No reasonable officer, indeed no reasonable person, upon hearing that someone appeared or smelled somewhat inebriated could, without any further information, reasonably conclude that such a person was on the brink of a diabetic coma. To the contrary, a reasonable officer hearing such a description would conclude that the individual had consumed alcohol — conduct that would most certainly *not* justify a warrantless entry into a home. As we have previously held, when there is a "complete lack of evidence that would support a reasonable suspicion," and the officers have provided a "wholly inadequate justification for the[ir] search, we conclude that it would have been clear to a reasonable officer that [such a search] was unlawful." *See Ramirez v. City of Buena Park*, 560 F.3d 1012, 1023 (9th Cir. 2009). Similarly,

in 2003, no reasonable officer would have believed that, where a two-car automobile incident resulted in damage to neither car and the drivers of both cars drove off without any apparent physical complaint or difficulty, he should be sufficiently concerned about possible injuries to one of the drivers to forcibly enter his home in order to conduct an investigation regarding his possible injuries. As a result, the defendants are not entitled to qualified immunity under the emergency exception.

**[18]** As for the exigency exception, both our conclusions that the officers lacked probable cause to enter Hopkins' home and that an investigation of a potential misdemeanor drunk-driving incident does not create an exigent circumstance were clearly established at the time the officers broke into the plaintiff's home. As to probable cause, this court determined as early as 1991 that "police officers ha[ve] a duty to conduct an investigation into the basis of [a] witness' report" and that absent such investigation the report alone does not support probable cause. *Fuller v. M.G. Jewelry*, 950 F.2d 1437, 1444 (9th Cir. 1991). This rule was reaffirmed a mere two years before the conduct at issue in this case. *See Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 925 (9th Cir. 2001). It was equally clearly established by 2003 that "an exigency related to a misdemeanor will seldom, if ever, justify a warrantless entry into the home." *LaLonde v. County of Riverside*, 204 F.3d 947, 956 (9th Cir. 2000). Moreover, we made clear a year later, in *United States v. Johnson*, that "where the underlying offense is only a misdemeanor," *such as the misdemeanor drunk-driving* at issue in *Welsh*, "law enforcement must yield to the Fourth Amendment." 256 F.3d 895, 909 n.6 (9th Cir. 2001) (en banc) (quoting *Welsh*, 466 U.S. at 753).

**[19]** The California Supreme Court's decision in *People v. Thompson* distinguishing *Welsh* cannot alter our conclusion that the prohibition of warrantless entry into a home to investigate misdemeanor drunk-driving was "clearly established" at

the time Officers Buelow and Bonvicino broke into Hopkins' home. For one thing, *Welsh*, *LaLonde*, and *Johnson* — binding precedents from the Supreme Court and this court clearly establishing that rule — all predate the conduct underlying this lawsuit, whereas *People v. Thompson* was decided three years *after* the officers' unconstitutional action. Furthermore, a decision by a state court contrary to a holding of this court cannot unsettle or "de-establish" the clarity of *federal* law. Although "[t]he Supreme Court has provided little guidance as to where courts should look to determine whether a particular right was clearly established at the time of the injury," we have held that "[i]n the Ninth Circuit, we begin our inquiry by looking to binding precedent. If the right is clearly established by decisional authority of the Supreme Court or this Circuit, our inquiry should come to an end." *Boyd v. Benton County*, 374 F.3d 773, 781 (9th Cir. 2004) (internal citation omitted) (citing *Capoeman v. Reed*, 754 F.2d 1512, 1514 (9th Cir. 1985)). Thus, with respect to the lack of probable cause and the lack of exigent circumstances — the absence of either one of which would preclude the officers' reliance on the exigency exception — the law as to both was clearly established in 2003 and the officers are not entitled to qualified immunity on the basis of that exception. Because it was also clearly established that the officers' conduct did not fall within the emergency exception, the two defendants are not entitled to qualified immunity on that basis either. Accordingly, the officers were properly denied summary judgment as to Hopkins' warrantless-entry claim.

## IV.   Arrest Without Probable Cause

The officers also appeal the denial of their qualified-immunity defense with respect to Hopkins' claim of unlawful arrest. This claim encompasses two different arrests: one that occurred inside Hopkins' home, and a second that occurred

once he was brought outside and placed under citizen's arrest. We analyze the two arrests separately.[12]

## A.   Arrest In Hopkins' Home

The Fourth Amendment protects against warrantless arrest inside a person's home in the same fashion that it protects against warrantless searches of the home, which is to say that police officers may not execute a warantless arrest in a home unless they have both probable cause and exigent circumstances. *See, e.g.*, *Payton*, 445 U.S. at 586 ("It is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreason-

---

[12]In *Fisher v. City of San Jose*, 558 F.3d 1069 (9th Cir. 2008) (en banc), this court held that an "armed standoff was a single Fourth Amendment event, a continuous process of formalizing [an] arrest." *Id.* at 1077. Here, by contrast, two *distinct* seizures took place, one occurring after the other was already accomplished. Drawing a distinction between two consecutive and overlapping "seizures" is a common and longstanding practice in Fourth Amendment jurisprudence, as in the case of so-called "*Terry* stops," *see Terry v. Ohio*, 392 U.S. 1, 16-19 (1968); *see also, e.g.*, *Rohde v. City of Roseburg*, 137 F.3d 1142, 1144 (9th Cir. 1998), or of unconstitutionally excessive force, *see Chavez v. Martinez*, 538 U.S. 760, 773 n.5 (2003) (plurality opinion); *Graham v. Connor*, 490 U.S. 386, 388, 394 (1989); *Pierce v. Multnomah County*, 76 F.3d 1032, 1042 (9th Cir. 1996) (quoting *Robins v. Harum*, 773 F.2d 1004, 1010 (9th Cir. 1985)). These longstanding precedents demonstrate that generally an individual who has already been seized can still be *further* seized for purposes of the Fourth Amendment — a proposition that is not inconsistent with *Fisher*'s holding that Fourth Amendment infringements suffered between the initiation of a seizure and the perfection, or "formalizing," of that same seizure may not be analyzed independently for purposes of the warrant requirement. *Fisher*, 558 F.3d at 1077.

Here, Hopkins' second seizure did not occur in the "process of formalizing" his first seizure, *id.*, which was accomplished, at the latest, when he was led from his house in handcuffs. *See infra* 34-35. Rather, much like a *Terry* stop followed by a formal arrest, the first seizure here preceded the second. Accordingly, the two arrests were independent Fourth Amendment events that can independently support separate causes of action under § 1983.

able."); *Welsh*, 466 U.S. at 749 ("[W]arrantless . . . arrests in the home are prohibited by the Fourth Amendment, absent probable cause and exigent circumstances."). In light of the above, because Hopkins was in fact seized inside his home, Officers Buelow and Bonvicino violated his Fourth Amendment rights by arresting him without a warrant for the same reasons that their emergency and exigency defenses fail to justify their warrantless entry. *See supra* Part III.B.

An arrest — or, to use the Fourth Amendment's terminology, a "seizure" — "occurs when a law enforcement officer, through coercion, 'physical force[,] or a show of authority, in some way restricts the liberty of a person.' " *United States v. Washington*, 387 F.3d 1060, 1069 (9th Cir. 2004) (quoting *United States v. Chan-Jimenez*, 125 F.3d 1324, 1325 (9th Cir. 1997)). "A person's liberty is restrained when, 'taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.' " *Id.* (quoting *Florida v. Bostick*, 501 U.S. 429, 437 (1991)). Here, taking the facts in the light most favorable to Hopkins, Officers Buelow and Bonvicino entered his home with guns drawn, ordered him to show his hands, told him that he was under arrest, handcuffed him, and took him outside. Under these circumstances, it is clear that the officers restricted his liberty and seized him. *See, e.g.*, *United States v. Washington*, 490 F.3d 765, 772 (9th Cir. 2007) (considering fact of police officer's "directing [someone] where to walk" in holding that a seizure occurred); *United States v. Manzo-Jurado*, 457 F.3d 928, 934 n.3 (9th Cir. 2006) (holding that a police officer's order to occupants of a truck to "show their hands" was a seizure); *United States v. Bravo*, 295 F.3d 1002, 1010 (9th Cir. 2002) ("Certainly handcuffing is a substantial factor in determining whether an individual has been arrested.").

**[20]** Numerous precedents from this court and others, including the United States Supreme Court, make it clear that

the officers' treatment of Hopkins inside his home constituted a seizure. There can be no doubt that the law in this respect was clearly established prior to 2003 and thus should have been known by a reasonable officer. *See, e.g.*, *Michigan v. Chesternut*, 486 U.S. 567, 573 (1988); *INS v. Delgado*, 466 U.S. 210, 215 (1984); *Bostick*, 501 U.S. at 437; *Chan-Jimenez*, 125 F.3d at 1326. Accordingly, we affirm the district court's order denying Officers Buelow and Bonvicino's motion for summary judgment on qualified immunity grounds with respect to Hopkins' unlawful arrest claim. However, because Officer Nguyen did not participate in the arrest inside Hopkins' home, we reverse the district court's denial of his motion for summary judgment with respect to this arrest. *See supra* Part III.C.

## B.   Citizen's Arrest

Hopkins also alleges that he was arrested for "hit-and-run" without probable cause.[13] This second arrest was executed pursuant to Talib's authority to perform a citizen's arrest under CAL. PENAL CODE § 837, which allows "[a] private person [to] arrest another . . . [f]or a public offense committed or attempted in h[er] presence." The issue with respect to this second arrest is thus whether, under the federal Constitution, police officers are required to have independent probable cause when effectuating an arrest authorized by a private citizen.

We first addressed this question in *Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912 (9th Cir. 2001). In that case, a woman who was arrested after having an argument with a city bus driver later brought suit under § 1983. We concluded that the "bus driver[ ] made a citizen's arrest . . . . and delegated to [the] [o]fficers . . . the task of taking [the

---

[13]Unlike in the other claims alleged, Officer Nguyen was an integral participant in this arrest because he provided Talib with the citizen's arrest form and explained the procedure to her.

plaintiff] into custody." 261 F.3d at 920. We upheld the grant of summary judgment to the officers on the plaintiff's state-law claims for false arrest because California law explicitly exempts officers effectuating a citizen's arrest from civil liability. *See* CAL. PENAL CODE § 847. However, we reversed dismissal of the plaintiff's federal claims, holding that the officers could be liable under the Fourth Amendment because they did not have sufficient independent probable cause to arrest Arpin. *See Arpin*, 261 F.3d at 925.

**[21]** Given *Arpin*'s rule that the federal Constitution requires police officers to have independent probable cause when effectuating a citizen's arrest, and taking the facts in this case in the light most favorable to Hopkins, the defendant-officers violated Hopkins' constitutional rights when they took him into custody because they did not have probable cause to support Talib's arrest for hit-and-run. The hit-and-run statute on which Talib predicated her arrest contains as an element that there be some damage to the vehicles (or to some other property). *See* CAL. VEH. CODE § 20002; People v. Carbajal, 899 P.2d 67, 72 n.10 (Cal. 1995) ("The essential elements of a violation of section 20002 [include] that the defendant: . . . knew damage resulted from the accident . . . ."). However, Officer Nguyen personally inspected and took photographs of the vehicles involved in the purported "accident," and those photographs do not appear to show *any* damage to the cars. "In this procedural context, where summary judgment [is at issue], we must credit the video evidence submitted by [the non-moving party]." *Menotti v. City of Seattle*, 409 F.3d 1113, 1150 (9th Cir. 2005). Furthermore, Hopkins also asserted in his deposition that "there was nothing wrong with either vehicle," an assertion we must take as true. If there was no damage to the cars, then the officers did not have probable cause to believe that a violation of § 20002 had occurred. Therefore, Hopkins has properly alleged that the officers acted unlawfully when they took him into custody on the basis of Talib's citizen's arrest without independent probable cause.

Having concluded that the officers violated Hopkins'
rights, we must next consider whether the rule that indepen-
dent probable cause must support an officer's effectuation of
a citizen's arrest was clearly established at the time Hopkins
was arrested. This is a close question. We conclude that even
though *Arpin* was decided two years before the conduct at
issue in this case, the rule it sets forth was not clearly estab-
lished at the time of Hopkins' arrest. Although *Arpin* held that
it was analyzing a citizen's arrest when it discussed the offi-
cers' liability under the state-law claims at issue, when the
court turned its attention to the federal claims it described the
municipal bus driver who executed the citizen's arrest as "ac-
t[ing] 'with the intent to assist the government in its investiga-
tory . . . purposes.' " *Arpin*, 261 F.3d at 924 (quoting *United
States v. Attson*, 900 F.2d 1427, 1433 (9th Cir. 1990)).
Accordingly, the court held that the citizen "summoned the
police . . . not for an independent purpose, but as a govern-
mental employee acting with the intent to assist the . . . Coun-
ty." *Id.* In light of this language, *Arpin* could reasonably be
read to suggest that the citizen bus driver was acting as an
agent of the state, and therefore not executing a true citizen's
arrest.[14] *Cf.* CAL. PENAL CODE § 837 (defining citizen's arrest
as executed by a "private person"). Given this lack of clarity,
a reasonable officer might not have known that taking Hop-
kins into custody solely on the basis of the citizen's arrest in
this case violated the Fourth Amendment.

Since *Arpin* was decided, both our court and a district court
in this circuit have held in unpublished opinions that the
"teachings in *Arpin* . . . require police officers to conduct
additional investigation on a citizen's arrest" in order to estab-
lish independent probable cause prior to effectuating that

---

[14]The *Arpin* court further held that the officers in that case did not have
independent probable cause to arrest the plaintiff, but it is unclear whether
the court's holding simply rearticulated the rule announced in *Fuller v.
M.G. Jewelry*, 950 F.2d 1437, 144 (9th Cir. 1991), that a statement from
an aggrieved witness is insufficient to support probable cause.

arrest. *Sin v. Crystal Park Hotel Casino*, 77 F. App'x 433, 434 (9th Cir. 2003) (internal citation omitted); *accord Salisbury v. Ward*, No. 06-2993-MMC, 2006 U.S. Dist. LEXIS 94025 at *10-11 (N.D. Cal. Dec. 19, 2006) ("[The requirement] that a warrantless arrest . . . 'be supported by probable cause . . . .' applies even when the arrestee is taken into custody pursuant to a citizen's arrest."). However, while unpublished opinions "can be considered in determining whether the law was clearly established," *Bahrampour v. Lampert*, 356 F.3d 969, 977 (9th Cir. 2004), both of these opinions were issued after the underlying conduct in this lawsuit, which renders them incapable of making the right at issue clearly established at the time of the violation.

[22] Because *Arpin* is unclear as to whether the bus driver in that case was acting as a quasi-law enforcement officer or as a private citizen in executing the arrest, we hold that the requirement that a police officer establish independent probable cause before taking individuals into custody solely on the basis of a citizen's arrest was not clearly established in 2003. *Arpin*'s less-than-clear reasoning makes it uncertain whether at that time a "reasonable officer" would have known that it was unlawful to take Hopkins into custody solely because Talib had arrested him. It is equally uncertain whether such an officer would have known that he needed independent probable cause in order to do so.[15] Accordingly, we hold that

---

[15]Until a year prior to the time when Hopkins was arrested, a California police officer who refused to take an individual into custody following a citizen's arrest could "be punished by a fine not exceeding ten thousand dollars ($ 10,000), or by imprisonment in the state prison, or in a county jail not exceeding one year;" that provision has since been repealed. CAL. PENAL CODE § 142 (2001), *amended by* Assem. No. 1835, 2001-2002 Sess. (Cal. 2002).

We do not mean to imply that a conflict between an officer's liability under state law versus under federal law creates a lack of clearly established federal law. Rather, when faced with a close question regarding whether the federal law itself is clearly established, we simply note that the fact that state law immunizes similar conduct may tend to support an officer's claim of qualified immunity.

although Hopkins' second arrest did indeed violate his constitutional right to be free from seizure absent probable cause, the officers are entitled to qualified immunity with respect to that arrest.[16]

## V.    Excessive Force

Hopkins' final claim is that the officers employed excessive force in executing the arrest inside his house. It is clearly established that the use of excessive force in effecting a seizure violates the Fourth Amendment. *See Tennessee v. Garner*, 471 U.S. 1, 8-9 (1985). The law of this circuit regarding excessive force as it relates to the use by police officers of drawn firearms was established by the en banc court in *Robinson v. Solano County*, 278 F.3d 1007 (9th Cir. 2002) (en banc). In that case, we held that "pointing a gun to the head of an apparently unarmed suspect during an investigation can be a violation of the Fourth Amendment, especially where the individual poses no particular danger." *Id.* at 1015. In *Robinson*, the court held that a constitutional violation had occurred where the officers pointed their guns at the plaintiff and "[t]he crime under investigation was at most a misdemeanor[,] the suspect was apparently unarmed and approaching the officers in a peaceful way[,] [t]here were no dangerous or exigent circumstances apparent at the time of the detention, and the officers outnumbered the plaintiff." *Id.* at 1014.

[23] Taking the facts in the light most favorable to the plaintiff, it is clear that this case is indistinguishable from *Robinson*. Officer Bonvicino stated in his declaration that, at least as of the time Hopkins got up from the bedroom floor, he knew that Hopkins "was not a threat to officer safety."

---

[16]Our holding therefore excuses Officer Nguyen from all liability, including liability for the excessive force claim, and dismisses him as a defendant in this case. Officers Bonvicino and Buelow, however, are not entitled to qualified immunity with respect to either the warrantless entry into Hopkins' home or the warrantless arrest inside his home.

However, Officer Buelow makes clear in his declaration that he did not holster his weapon until after Hopkins was handcuffed, sometime after Officer Bonvicino described Hopkins as nonthreatening. Furthermore, the facts in the record, including the officers' own testimony that their reason for forcefully entering Hopkins' home was that they suspected he was suffering from a medical emergency, suggest that they were fully aware at all times that Hopkins did not pose a threat to anyone. As to the other facts described in *Robinson*, there is no dispute that the officers here outnumbered Hopkins, that he was unarmed, and that any putative crime the officers might have been investigating was a misdemeanor. Because *Robinson* was the law of this circuit at the time the officers arrested Hopkins, it was clearly established that the force they used was excessive. Accordingly, the district court's denial of summary judgment on this ground with respect to Officers Bonvicino and Buelow is affirmed. The district court's grant of summary judgment on this claim in favor of Officer Nguyen, who did not participate in the arrest inside Hopkins' home, is also affirmed. *See supra* note 16 and *supra* Part III.C.

## Conclusion

The district court's denial of summary judgment with respect to Officers Bonvicino and Buelow is **AFFIRMED** except with respect to the citizen's arrest part of the warrantless-arrest claim. The grant of summary judgment in favor of Officer Nguyen with respect to the excessive force claim is also **AFFIRMED**. The denial of summary judgment to Officer Nguyen with respect to the unlawful warrantless entry and unlawful arrest claims is **REVERSED**. The case is **REMANDED** for further proceedings consistent with this opinion.

**AFFIRMED in part, REVERSED in part, and REMANDED.**